WINDOM, Presiding Judge.
This Court's opinion of June 13, 2014, is withdrawn, and the following opinion is substituted therefor.
Tawuan Townes appeals his conviction for capital murder and his sentence of death. Townes was convicted of murder made capital for intentionally killing Christopher Woods during the course of a burglary. See § 13A-5-40(a)(4), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Townes be sentenced to death. The Houston Circuit Court accepted the jury's recommendation and sentenced Townes to death.
Facts
Townes had plans to rob Woods, a known drug dealer. Woods lived in a house in Dothan with his girlfriend, India Starks. On November 13, 2008, Townes and Cornelius Benton drove to Woods's house. Townes was armed with a .22 caliber rifle, and Benton was armed with a .380 caliber pistol that belonged to Townes's brother. Townes and Benton wore dark clothing and obscured their faces to conceal their identities. Townes also wore a toboggan cap.
Around 2 p.m., Starks heard Townes and Benton bang on the door, and, as Woods looked outside, they kicked open *456 the door and entered the house. Woods said, "Please don't do this.... Man, don't do this. Please don't do this." (R. 437.) Woods backed away and sat in a chair, at which point the men "told him to shut up and just tell [us] where it's at." (R. 437.) As Woods begged for his life and Starks's life, Benton repeatedly hit him in the face to force Woods to give them money. Townes shot Woods in the chest with the .22 caliber rifle and Benton continued to hit Woods. Benton then shot Woods in the leg, after which he resumed hitting Woods in the face and demanding money. Starks heard Woods screaming and begging, "Man, don't do this." (R. 450.)
After Woods was shot the second time, Starks ran to a neighbor's house to telephone emergency 911. As Starks was escaping, one of the men asked, "Where you going, bitch?" (R. 451.) While Starks was on the telephone with emergency 911, she saw the two men leave. Starks went back to Woods's house to attend to Woods. According to Starks, the room where the attack occurred was ransacked, Woods was slumped over in the chair, and her cellular telephone was missing. Woods died as a result of the bullet wound to the chest.
When Townes was arrested, he was in possession of the SIM card from Starks's cellular telephone.[1] After Townes was arrested, he gave a statement to police officers. In his statement, Townes admitted that he and Benton went to Woods's house to rob Woods because Townes needed money. Townes, however, adamantly denied intending to kill Woods. Townes stated that he intended to scare Woods when he shot the .22 caliber rifle and that the rifle used only "little bullets." (C. 500.)
After hearing closing arguments of counsel and being instructed on the law by the circuit court, the jury convicted Townes of murder made capital because it was committed during the course of a burglary.
Standard of Review
This Court has explained:
" 'When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) ; '[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986) ; and we make ' "all the reasonable inferences and credibility choices supportive of the decision of the trial court." ' Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761."
State v. Hargett, 935 So.2d 1200, 1203 (Ala.Crim.App.2005). A circuit court's "ruling on a question of law[, however,] carries no presumption of correctness, and this Court's review is de novo." Ex parte Graham, 702 So.2d 1215, 1221 (Ala.1997). Thus, "[w]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment." Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004).
Further, because Townes has been sentenced to death, this Court must search the record for plain error. Rule 45A, Ala. R.App. P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error *457 or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
" ' "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." ' Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) ). In United States v. Young, 470 U.S. 1, 15 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
" 'The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," United States v. Frady, 456 U.S. 152, 163 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S. at 163 n. 14.'
"See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would 'seriously affect the fairness or integrity of the judicial proceedings,' and that the plain-error doctrine is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result' (internal quotation marks omitted))."
11 So.3d at 938. "The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal." Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Although Townes's failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991).
I.
On appeal, Townes first argues that the circuit court's jury instructions regarding intent erroneously created a mandatory presumption on the issue of specific intent to kill, which alleviated the State's burden to prove Townes's specific intent. Specifically, Townes argues that the circuit court erroneously instructed the jury that " 'intent must be inferred if the act was done deliberately and death was reasonably to be apprehended or expected as a natural and probable consequence of the act.' " (Townes's brief, at 12 (quoting R. 824).) According to Townes, the circuit court's instruction created a mandatory presumption on the issue of specific intent, relieved the State of its burden to prove intent, and violated Townes's right to due process. Townes did not raise this argument below; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
It is well settled that "[t]he Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' "
*458 Williams v. State, 710 So.2d 1276, 1334 (Ala.Crim.App.1996) (quoting In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ). Thus, in a prosecution for capital murder, the State bears the burden of proving beyond a reasonable doubt that the defendant had the specific intent to kill. See § 13A-5-40(b), Ala.Code 1975; Heard v. State, 999 So.2d 992, 1005 (Ala.2007) ("[A] defendant must have the intent to kill in order to be found guilty of a capital offense." (citing § 13A-5-40(b), Ala.Code 1975, and Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998) ("No defendant can be found guilty of a capital offense unless he had an intent to kill." (citing Beck v. State, 396 So.2d 645, 662 (Ala.1981) and Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) )))).
" 'In Sandstrom [v. Montana, 442 U.S. 510 (1979) ], the Supreme Court [of the United States] held that instructions which a reasonable jury could interpret as an "irrebuttable direction by the court to find intent" violate a defendant's due process rights. Sandstrom, 442 U.S. at 517, 99 S.Ct. at 2455-56.' " Blackmon v. State, 7 So.3d 397, 435 (Ala.Crim.App.2005) (quoting Hart v. State, 612 So.2d 520, 529 (Ala.Crim.App.1992) ). According to the Supreme Court, the principle that a defendant cannot, consistent with the Due Process Clause of the Fourteenth Amendment, be convicted unless the State proves beyond a reasonable doubt each element of the crime, "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." Francis v. Franklin, 471 U.S. 307, 313, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (citations omitted).
" 'The threshold inquiry in ascertaining the constitutional analysis applicable to [a jury instruction relating to presumptions] is to determine the nature of the presumption it describes.' " Francis, 471 U.S. at 313-14 (quoting Sandstrom, 442 U.S. at 514. Specifically, this "[C]ourt must determine whether the challenged portion of the instruction creates a mandatory presumption or merely a permissive inference." Francis, 471 U.S. at 313-14 (internal citations omitted). The Supreme Court of the United States has explained:
"A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion."
Francis, 471 U.S. at 314 (footnote omitted). The distinction is critical. Mandatory presumptions "violate the Due Process Clause [because] they relieve the State of the burden of persuasion on an element of an offense." Id. (citations omitted). "A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." Id. Although a mandatory presumption relating to an element of the offense violates the Due Process Clause, a permissive inference is constitutional unless "the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Id. at 314-15 (citations omitted).
Further, there are two types of mandatory presumptions-a mandatory-conclusive presumption and a mandatory-rebuttable presumption. Francis, 471 U.S. at 314 n. 2.
"A conclusive presumption removes the presumed element from the case once *459 the State has proved the predicate facts giving rise to the presumption. A rebuttable presumption does not remove the presumed element from the case but nevertheless requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted."
Francis, 471 U.S. at 314 n. 2 (citing Sandstrom v. Montana, 442 U.S. 510, 517-18, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) ). A mandatory rebuttable presumption shifts the burden to the defendant to disprove an element of the offense, but requires the jury to determine whether that element of the offense exists. A mandatory conclusive presumption is more troubling, because it relieves the State of its burden to establish an element of the offense, which "conflicts with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime, and ... invades [the] factfinding function which in a criminal case the law assigns solely to the jury" by removing from the jury's consideration whether an element of the offense exists. Sandstrom, 442 U.S. at 523 (internal citations omitted).
The Supreme Court explained that, to determine what type of presumption was created by a jury instruction, a court's
"[a]nalysis must focus initially on the specific language challenged, but the inquiry does not end there. If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption. Cupp v. Naughten, 414 U.S. 141, 147 (1973). This analysis 'requires careful attention to the words actually spoken to the jury ..., for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction.' Sandstrom, 442 U.S. at 514."
Francis, 471 U.S. at 315.
Here, the original record filed with this Court supported Townes's argument. The original record indicated that the circuit court had instructed the jury that specific "intent must be inferred if the act was done deliberately and death was reasonably to be apprehended or expected as a natural and probable consequence of the act." (R. 824.) Consequently, this Court agreed with Townes's assertion that the circuit court's erroneous instruction created a mandatory presumption and, on June 13, 2014, reversed Townes's capital-murder conviction and sentence of death.
After this Court reversed Townes's conviction and sentence, the circuit court filed a supplemental record. In the supplemental record, the circuit court explained:
"The Alabama Court of Criminal Appeals issued an 'opinion' June 13, 2014 reversing and remanding the above styled case. The reason for the reversal was because the trial court allegedly gave a mandatory-conclusive presumption instruction using the word 'must.' Upon reviewing the Court of Criminal Appeals' opinion this court listened to the court reporter's tape recording of the jury instruction and the tape reveals this court used the word 'may' and not 'must.' The word 'may' allows for a permissive inference and not a mandatory-conclusive inference. Therefore, the *460 transcript submitted to the Alabama Court of Criminal Appeals is incorrect."
(3d Supp. C. 22.) After the circuit court informed this Court that the record was incorrect, this Court ordered the parties to brief whether the record could be corrected. On July 15, 2014, the parties filed briefs regarding correcting the record. After considering the parties' briefs, on March 3, 2015, this Court, by order, remanded the cause to the circuit court with instructions for the circuit court to appoint a different court reporter to transcribe the guilt-phase jury instructions and to transmit a supplemental/corrected transcript to this Court. See Rule 10(g), Ala. R.App. P. ("The appellate court may, on motion of a party or on its own initiative, order that a supplemental or corrected record be certified and transmitted to the appellate court if necessary to correct an omission or misstatement."); In re Holmes, 104 Ohio St.3d 664, 821 N.E.2d 568, 571 (2004) (holding that "[a]n appellate court has the power on its own initiative to order the correction of an imperfect trial record," and the failure to do so constituted an abuse of discretion); Bishop v. State, 833 So.2d 92, 93 (Ala.Crim.App.2002) ; Zwerin v. 533 Short North LLC, 15 F.Supp.3d 769, 772 (S.D.Ohio 2014) ; People v. Ray, 302 P.3d 289, 292 (Colo.App.2012).
The circuit court complied with this Court's instruction and, on April 9, 2015, filed a corrected record. The corrected record establishes that the circuit court gave the following instruction regarding specific intent:
"A specific intent to kill is an essential ingredient of capital murder as charged in this indictment, and may be inferred from the character of an assault, the use of a deadly weapon, or other attendant circumstances. Such intent may be inferred if the act was done deliberately and death was reasonably to be apprehended or expected as a natural and probable consequence of the act."
(R. on Return to Remand 21.) (Emphasis added.)
The circuit court's instruction to the jury that it may infer intent created a permissible presumption as opposed to a mandatory presumption. See Blackmon, 7 So.3d at 434-35 (holding that the circuit court's instruction that specific "intent may be inferred if the act is done deliberately and the death was reasonably to be apprehended or expected as a natural and probable consequence of the act" created a permissive presumption). Accordingly, no error, plain or otherwise, resulted from the circuit court's jury instructions regarding specific intent, and this issue does not entitle Townes to any relief.
II.
Townes next argues that the State improperly admitted the contents of a backpack that belonged to him. Specifically, Townes argues that the State improperly admitted .45 caliber bullets, a magazine for a .45 caliber pistol, and handwritten rap lyrics. According to Townes, the .45 caliber bullets, magazine, and lyrics were not connected to Woods's murder; therefore, they were irrelevant. Townes also argues that the items were admitted to show his bad character in violation of Rule 404, Ala. R. Evid. Townes further argues that, during the guilt phase, the prosecutor improperly commented on the .45 caliber bullets to show Townes's bad character. He argues that, during the penalty phase, the prosecutor improperly used the rap lyrics to show Townes's bad character. Townes did not object to the introduction of the contents of his backpack at trial or to the prosecutor's comments; therefore, these issues will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
*461 During the guilt phase of the trial, the State admitted a backpack and its contents that were seized from property Townes had been storing at Beverly Harris's house. Townes had lived at Harris's house. The contents of the backpack were described as, among other things, a fully loaded magazine for a .45 caliber pistol, loose .45 caliber bullets, and a writing. During the guilt phase, the writing was never mentioned again. The magazine and bullets, however, were mentioned. During closing argument, the prosecutor stated:
"How many 18-year-olds do you know they've got .45 caliber clips with bullets this size in their bag where they're staying? But no gun. What happened to the gun? Draw your own inference."
(R. 749.) Later, the prosecutor stated:
"[D]id you ever hear [the trial attorney] talk about the .45 caliber bullets that were in his backpack? He didn't touch those, did he? He didn't touch those because that does away with that little story that he's poor, poor pitiful little me, had no place to live."
(R. 785.)
During the penalty phase, the prosecutor asked a number of questions about the .45 caliber bullets, such as: "Would you agree ....45 caliber bullets ... are not the type of bullets, in other words, weapons that a normal 18-year-old would have?" (Supp. R. 75.) Also, during the penalty phase, Harris stated that she did not recognize the writing as Townes's writing and that Townes never listened to rap music when he was with her. During rebuttal closing argument, the prosecutor stated: "To think, that walks your streets, that has those kind of bullets. You look and read the rap crap that's in here about what's written in his bag." (R. 980.)
The contents of Townes's backpack do not appear to have been relevant in the guilt or penalty phases of Townes's trial. See Rule 401, Ala. R. Evid. (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); § 13A-5-45(d), Ala.Code 1975 ("Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."). Nothing in the record indicates that the .45 caliber bullets and magazine or the rap lyrics were connected in any manner to Woods's murder. Thus, Townes's possession of those items did not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala. R. Evid. Because evidence indicating that Townes possessed .45 caliber bullets, a magazine for those bullets, and rap lyrics was not relevant, it was inadmissible and should not have been the subject of comment by the State. Rule 402, Ala. R. Evid.; § 13A-5-45(d), Ala.Code 1975.
Although evidence relating to Townes's possession of the items in his backpack was irrelevant, any error in its admission was harmless and did not rise to the level of plain error. Rule 45A, Ala. R.App. P. Townes argues that evidence relating to his possession of the items showed bad character and a criminal propensity. However, the jury was well aware of Townes's bad character and propensity for violent crime without considering the items seized from the backpack.
*462 In his statement, Townes admitted that he was the mastermind who planned the robbery and burglary. Townes admitted that he had obtained one of the guns used during the commission of the crime. He admitted to the violent torture of Woods in an attempt to compel Woods to reveal where he had hidden his property. Starks also testified to Townes's participation in the violent acts against Woods. Townes fully admitted his use of a firearm during the commission of a violent felony. During his statement, Townes also informed the police officers of his willingness to kill during a robbery. While attempting to explain that he did not receive any proceeds from the crime and did not intend to kill Woods at the particular moment at which he was killed, the following occurred:
"[Townes]: ... We didn't get nothing.
"[Officer]: Why, you couldn't find it?
"[Townes]: Yea, because ... when [Benton] had already shot [Woods], that when [Woods] just stopped saying some'em. And I already know so I was like man, You ain't supposed to shot or anything. If you gonna rob somebody, you supposed to rob 'em and then [kill] 'em. When they tell you where it's at you can decide to kill 'em or not kill 'em. But he shot before we even could get anything."
(C. 501.) Thus, the jury was well aware of Townes's propensity toward violent and deadly criminal acts. The only question before the jury was whether Townes intended to kill Woods when he shot Woods in the chest or whether, at that time, he merely intended to scare Woods and would decide whether to kill him later.
In Riley v. State, 166 So.3d 705, 721 (Ala.Crim.App.2013), this Court addressed a substantially similar issue. During Riley's trial for murder made capital because it was committed during a robbery, the State presented testimony establishing that Riley had bad character and a propensity to engage in criminal behavior, specifically, robbery and theft. Id. Riley argued that the admission of the bad-character evidence violated Rule 404(b), Ala. R. Evid., and entitled him to a new trial. Id. Addressing Riley's argument, this Court held:
"Assuming without deciding that the circuit court erred in admitting this particular testimony, that error did not affect the outcome of the proceeding and, thus, was harmless. See Rule 45, Ala. R.App. P.; see also Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000) ('The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless.'). In this case, Riley admitted committing the robbery and causing Kirtley's death, but he maintained that he did not intend to kill Kirtley. Specifically, Riley argued that he merely intended to rob Dandy's in order to pay his debts. Therefore, any error in the admission of ... testimony relating to Riley's propensity to commit robbery was harmless and does not entitle Riley to any relief. Rule 45, Ala. R.App. P.; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)."
Riley, 166 So.3d at 721.
Like Riley, Townes admitted to planning and executing the violent crime against Woods. Townes, however, went further than Riley and explained to the police officers at what point during a robbery he would decide the fate of his victim. Thus, the jury was-without the evidence from the backpack-well aware of Townes's bad character and propensity for violent crimes. Consequently, "any error in the admission of [the items from Townes's *463 backpack] was harmless," and does not rise to the level of plain error. Riley, 166 So.3d at 721 (citing Rule 45, Ala. R.App. P., and Chapman, 386 U.S. at 24 ). See also, Rule 45A, Ala. R.App. P.
III.
Townes next argues that the circuit court committed reversible error when it admitted into evidence his mug-shot photograph because it indicated that he had a criminal history. Townes also argues that the State improperly elicited testimony indicating that he had changed his hairstyle since Woods's murder. Townes did not raise these objections at trial; therefore, these issues will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
A.
Townes argues that it was plain error for the prosecutor to show the jury his mug shot during its guilt-phase opening statement and to introduce his mug shot into evidence. This Court disagrees.
In McNabb v. State, 887 So.2d 929, 972 (Ala.Crim.App.2001), this Court, addressing a similar issue, explained:
"McNabb contends that the trial court erred in allowing a 'mug shot' of him to be introduced into evidence. (Issue IV in McNabb's brief.) He argues that the admission of the mug shot automatically requires a reversal because, he says, the photograph suggested to the jury that he had a prior criminal history.
"....
"The photograph of McNabb was the traditional mug-shot photograph consisting of juxtaposed frontal and profile poses. McNabb's name and a nine-digit number were printed directly under the photograph. The State introduced the photograph into evidence during the testimony of Officer William Perkins, at the same time it introduced two other photographs of McNabb, both of which showed McNabb lying face down in the ditch after he had been shot.
"In Ex parte Long, 600 So.2d 982 (Ala.1992), overruled on other grounds, Ex parte Edwards, 816 So.2d 98 (Ala.2001), the Alabama Supreme Court stated the following regarding the admissibility of mug shots:
" 'Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history. Gross v. State, 395 So.2d 485 (Ala.Crim.App.1981). However, under certain circumstances, admitting a mug shot into evidence does not constitute reversible error.
" 'We find no cases from this Court directly on the point of the admissibility of mug shots, but the Court of Criminal Appeals has, in numerous cases, relied on the three prerequisites established in United States v. Harrington, 490 F.2d 487 (2d Cir.1973), for a ruling that the introduction of a "mug shot" photograph does not result in reversible error. See, e.g., Williams v. State, 546 So.2d 705 (Ala.Crim.App.1989) ; Jones v. State, 451 So.2d 389 (Ala.Crim.App.1984) ; Gross v. State, supra; Williamson v. State, 384 So.2d 1224 (Ala.Crim.App.1980) ; Holsclaw v. State, 364 So.2d 378 (Ala.Crim.App.1978) ; but see Brown v. State, 229 Ala. 58, 155 So. 358 (1934) (fact that defendant was in jail when photograph was taken did not present reversible error as to admission of the photograph). The three requirements set out in Harrington are:
" ' "1. The Government must have a demonstrable need to introduce the photographs; and *464 " ' "2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
" ' "3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs."
" ' Harrington, 490 F.2d at 494. We conclude that these three inquiries are appropriate criteria to consider when determining the admissibility of a mug shot; however, the failure to meet one or more of these criteria would not necessarily result in reversible error. We shall still apply Rule 45, Ala. R.App. P., when deciding whether to reverse or set aside a judgment for error.'
" 600 So.2d at 989. (Emphasis added.)
"In this case, two of the three prongs of the Harrington test were satisfied. The identity of the shooter was not an issue in this case-McNabb admitted that he had killed Officer Gordon and had shot at Officer Perkins and Sanford Sharpe-and, therefore, the State did not have a demonstrable need to introduce the mug shot. However, the photograph itself did not imply that McNabb had a prior criminal record and the manner in which the photograph was introduced did not draw attention to its source or implications. Although the photograph was the traditional mug-shot photograph, with juxtaposed frontal and profile views, which, the Alabama Supreme Court has noted, generally ' "produces a 'natural, perhaps automatic' inference of prior encounters with the police," ' Long, 600 So.2d at 991, quoting United States v. Harrington, 490 F.2d 487, 495 (2nd Cir.1973), the photograph contained no markings indicating when it was taken, i.e., there was no date on the photograph. Therefore, there was nothing from which the jury could have inferred that McNabb had a prior criminal record. Moreover, the manner in which the photograph was introduced, with two other photographs of McNabb taken on the day of the crimes, did not draw attention to its source or implications, and, also, tended to rebut any inference the jury may have gleaned from the photograph that McNabb had a prior criminal history. The lack of a date on the photograph coupled with the manner in which the photograph was introduced suggested that it was taken when McNabb was arrested for the present crimes and it did not imply that McNabb had a prior criminal record. Therefore, we find no error, plain or otherwise, in the admission of the mug shot."
McNabb, 887 So.2d at 971-73.
As in McNabb, the mug-shot photograph did not indicate the date that it was taken and did not indicate that Townes had a prior criminal history. Rather, the mug shot appeared on its face to have been taken when Townes was arrested for the current charge. The prosecutor stated that the mug-shot photograph depicted "how Tawuan Townes looked on the day of the burglary and the capital murder." (R. 367.) Further, the State presented evidence indicating that the mug-shot photograph was taken the morning Townes was arrested for Woods's murder. (R. 666.) Thus, the manner in which the mug-shot photograph was introduced "did not draw attention to its source or implications" but, rather, "tended to rebut any inference the jury may have gleaned from the photograph that [Townes] had a prior criminal history." McNabb, 887 So.2d at 973. Because the mug-shot photograph did not contain any indication that Townes had a prior criminal history and *465 because the manner in which the photograph was introduced tended to rebut any inference of a prior criminal history, no error, much less plain error, resulted from its admission into evidence. Rule 45A, Ala. R.App. P. Consequently, this issue does not entitle Townes to any relief.
Within this section of his brief, Townes also argues that, during the guilt-phase closing, the State improperly commented on his appearance during the crime, thus, showing his bad character. Townes did not raise this argument at trial; therefore, this Court's review is restricted to plain error only. Rule 45A, Ala. R.App. P.
During its guilt-phase closing argument, the State said:
"They robbed him. And robbery is using force against a person, and they beat him. And he begged for his life. That's the testimony. He begged and he begged and he begged. And what did they do? They continued to hit him and they shot him. And he's in the chair and India is seeing it. And then finally she has so much fear from watching that she runs. And what do they say? Hey, bitch, where you going. That's the kind of cowards they are. Big, tough men with weapons against a man who's defenseless and a woman. He ain't so tough in this courtroom today. And he sure looks a lot different, whole-heartedly."
(R. 764-65.) Later, during the State's closing argument, it highlighted evidence indicating that Townes set out to scare and rob Woods and that he intentionally killed Woods. During that argument, the State said:
"[Townes said to Stark,] where you going, bitch? That's what he said. That's what he said. But today he doesn't have the dreads. He doesn't have the weapon. He doesn't have the mask. He doesn't have the bandanna."
(R. 797.)
According to Townes, the State's comments were "designed to impugn Mr. Townes's character." (Townes's brief, at 37.) Townes, however, has not directed this Court to any law prohibiting the State from commenting on a defendant's attempt to intimidate his victim by his appearance and actions during the crime. Nor has he cited any law prohibiting the State from contrasting a defendant's calm, docile appearance at trial to his violent behavior and intimidating appearance during the commission of the offense. Further, the jury was well aware of the difference between Townes's appearance during the commission of the offense and during the trial. At trial, the jury could see Townes. The State admitted the video of Townes's statement at the time of his arrest that showed his appearance shortly after the commission of the offense. Additionally, Townes's statement and Stark's testimony painted a vivid picture of Townes's appearance during the commission of the crime, i.e., his hair, his clothes, his bandanna, and his weapon.
Thus, the jury was well aware, without the State's comments, that Townes did not appear at trial as he did during the commission of the crime. Here, the prosecutor's comments contrasting Townes's behavior and appearance in court with his behavior and appearance during the crime were harmless. "[T]he jury us[ing] its common sense," Sattari v. State, 577 So.2d 535, 540 (Ala.Crim.App.1990), was well aware of the contrast based its own observations at trial and the evidence presented to it. See Kelley v. State, 246 So.3d 1032 (Ala.Crim.App.2014) (holding that the State's improper comments were harmless when the comment related to a fact that *466 the jury would have inferred from properly admitted evidence). Cf. Gobble v. State, 104 So.3d 920, 959 (Ala.Crim.App.2010) (holding that " '[t]estimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred' ") (quoting Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993) ). Accordingly, the error, if any, in the State's comments did not rise to the level of plain error, and this issue does not entitle Townes to any relief. Rule 45A, Ala. R.App. P.
B.
Townes also argues that the State improperly presented evidence that he changed his appearance during the time between Woods's murder and the trial. Specifically, Townes argues that the State presented evidence establishing that he had gotten a haircut before his trial and improperly commented on the change in Townes's appearance. According to Townes, evidence and comments relating to his haircut amounted to comments on his decision not to testify.
At trial, the State presented evidence that Townes had gotten a haircut during the time between the commission of the offense and the trial. During closing argument, the prosecutor stated:
"I want you to remember when you deliberate this case that-who is the one in this courtroom that changed his appearance, how he looked on November the 13th, 2008, what he was wearing, and what he had planned to do before Cornelius Benton ever entered the picture?"
(R. 747-48.) The prosecutor also made the following comment:
"So as you see him sitting in the courtroom today, that's not how he was that day. You'll have the picture with his braids all over and the look, if you watched him on TV. And all he could say in his statement, Man, I F'ed up. What am I going to get? Am I going to get life? How much time am I going to do? How much time? Do you think I'm going to have to serve much time? My goodness, people. He executed a human being over a few dollars, blood money, and to get drugs and took a human being's life."
(R. 754.)
The State may elicit evidence indicating that a defendant has changed his appearance during the time between the commission of the crime and the trial when identity is at issue or when a defendant's change in appearance is relevant to show consciousness of guilt. Shiflett v. State, 52 Ala.App. 476, 480, 294 So.2d 444, 447 (Crim.App.1973) ; People v. Kurena, 87 Ill.App.3d 771, 778, 43 Ill.Dec. 277, 410 N.E.2d 277, 284 (1980) ; Pickett v. State, 222 Md.App. 322, 335, 112 A.3d 1078, 1085-86 (2015). The State may also comment on a defendant's change in appearance when evidence relating to that change has been properly admitted. Johnson v. State, 120 So.3d 1130, 1164 (Ala.Crim.App.2009). The State may not, however, argue that the difference in a defendant's appearance was the result of defense counsel's attempt to "polish" the defendant for the jury. Chamberlain v. State, 46 Ala.App. 642, 643, 247 So.2d 683, 684 (Crim.App.1971). To do so, improperly "impute[s] unethical conduct on the part of [the defendant's] attorneys." Id. The State also may not comment on the defendant's appearance in a manner that relates to the defendant's decision not to testify. See Bestor v. State, 209 Ala. 693, 693-94, 96 So. 899, 900 (1923) (holding that the State improperly commented on the defendant's decision not to testify when it told the jury the following: " 'Gentlemen, there she is. They don't *467 want you to see her, [and] I don't blame them. I would not want people to see her either.' ").
Here, the testimony presented at trial and the prosecutor's comments regarding Townes's haircut did not relate to his decision not to testify. (R. 747, 754.) Rather, as Townes concedes in his brief, the prosecutor appeared to be commenting on Townes's change in appearance to show consciousness of guilt. See (Townes's brief, at 38-39) (arguing that "the prosecutor's repeated references to Mr. Townes's changed appearance at trial, specifically, the fact that Mr. Townes had cut his hair and no longer had 'dreads', suggested that by altering his appearance, Mr. Townes was attempting to disguise himself or otherwise deceive the jury and was thereby conscious of his guilt"); (Townes's brief, at 35) (stating that the prosecutor "directed the jury to consider Mr. Townes's changed appearance as evidence of his guilt"). Further, the circuit court instructed the jury that Townes had a right not to testify and that no inference could be drawn from his silence. See Peraita v. State, 897 So.2d 1161, 1204 (Ala.Crim.App.2003) (" 'Jurors are presumed to follow the trial court's instructions.' " (quoting Bryant v. State, 727 So.2d 870, 874-75 (Ala.Crim.App.1998) )); Burgess v. State, 827 So.2d 134, 162 (Ala.Crim.App.1998) ("Jurors are presumed to follow the court's instructions.").
Because the prosecutor did not comment on Townes's decision to remain silent and because the circuit court instructed the jury that no inference could be drawn from Townes's decision not to testify, no error, much less plain error, resulted from the evidence and comments relating to Townes's change of appearance. Rule 45A, Ala. R.App. P. Therefore, this issue does not entitle Townes to any relief.
IV.
Townes next argues that the State used it peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, Townes argues that the State "used [its] peremptory strikes to remove all but one of the qualified African Americans from the venire." (Townes's brief, at 43.) He further argues that the State targeted African-American veniremembers for questioning and that the African-Americans struck by the State shared only this one characteristic-their race-and in all other respects they were as heterogeneous as the community as a whole. Finally, Townes asserts that the Houston County District Attorney's Office has a history of racial discrimination. According to Townes, these factors raise an inference of racial discrimination; therefore, this Court should remand the cause with instructions for the circuit court to conduct a Batson hearing. Townes did not raise a Batson objection at trial; therefore, this issue will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.
"To find plain error in the context of a Batson... violation, the record must supply an inference that the prosecutor was 'engaged in the practice of purposeful discrimination.' " Blackmon, 7 So.3d at 425 (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987) ). See also Saunders v. State, 10 So.3d 53, 78 (Ala.Crim.App.2007) ("For an appellate court to find plain error in the Batson context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges."). In evaluating a Batson... claim, a three-step process must be followed. As explained by the Supreme Court of the United States in *468 Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) :
"First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [ Batson v. Kentucky,] 476 U.S. [79,] 96-97 [ (1986) ]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id. at 97-98. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id. at 98."
537 U.S. at 328-29.
With respect to the first step of the process-the step at issue here-"[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination." Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997) (citing Ex parte Branch, 526 So.2d 609, 622 (Ala.1987) ). "A defendant makes out a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' surrounding a prosecutor's conduct during the defendant's trial." Lewis v. State, 24 So.3d 480, 489(Ala.Crim.App.2006) (quoting Batson, 476 U.S. at 94 ), aff'd, 24 So.3d 540 (Ala.2009). "In determining whether there is a prima facie case, the court is to consider 'all relevant circumstances' which could lead to an inference of discrimination." Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of "relevant circumstances" to consider in determining whether a prima facie case of race discrimination has been established:
"The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
"1. Evidence that the 'jurors in question share[d] only this one characteristic-their membership in the group-and that in all other respects they [were] as heterogeneous as the community as a whole.' [ People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [ (1978) ]. For instance 'it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,' Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
"2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson [v. Kentucky], 476 U.S. [79] 97, 106 S.Ct. [1712] 1723 [ (1986) ].
"3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
"4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723 ; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
"5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987) ; People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986) ; People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
*469 "6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
"7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
"8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721 ; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049 [ (1976) ].
"9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner , supra."
Id. at 622-23.
Applying the factors established in Branch, this Court holds that the record does not raise an inference of racial discrimination. Initially, this Court notes that both Townes and Woods were African-American. After the veniremembers were struck for cause or excused, eight African-Americans were qualified to serve on the jury. The State used 5 of its 20 peremptory challenges to remove African-Americans, leaving 3 on the jury.[2] Defense counsel struck two African-Americans. The State's use of 5 of its 20 peremptory challenges to remove 5 of 8 African-Americans from the venire, did not, without more, establish an inference of racial discrimination. See Johnson v. State, 823 So.2d 1, 20 (Ala.Crim.App.2001) (holding that the State's "use[ ] [of] 6 (less than half of its 14) strikes to remove 6 of the 9 blacks from the venire" did not establish an inference of racial discrimination).
Further, contrary to Townes's argument, the African-Americans struck by the State did not "share only this one characteristic-their membership in the group-and [were not] in all other respects ... as heterogeneous as the community as a whole." Branch, 526 So.2d at 622. For instance, D.S., an African-American struck by the State, equivocated regarding his feelings on the death penalty, possibly knew the victim, and had been arrested for theft. J.S., another African-American struck by the State, had a brother who had been arrested on drug charges. J.S. and B.W. both knew witnesses in the case. Further, T.T. indicated that she had an appointment with a doctor that conflicted with the trial. When asked after striking the jury whether he wanted to raise a Batson objection, defense counsel stated: "With regard to race, there was something in the record for every one ... of them." (R. 341.) The following day, defense counsel again stated that the defense did not want to raise a Batson objection. The court asked defense counsel if they agreed "there were legitimate reasons for any strikes," and defense counsel agreed. (R. 360.) Defense counsel, who observed the jurors throughout voir dire, then stated: "As far as the African-American strikes, we believe there's a record of-I mean there is a reason on the record from the voir dire for each strike." (R. 361.) Consequently, *470 the record does not establish that the African-Americans struck by the State "share[d] only this one characteristic-their [race]-and [were] in all other respects ... as heterogeneous as the community as a whole." Branch, 526 So.2d at 622.
Further, the record does not support Townes's argument that the State targeted African-Americans for questioning during voir dire. The State asked questions of African-Americans and other races alike. Many of the jurors to whom the State directed questions are identified only as potential jurors. The State questioned African-Americans and other races regarding their feelings on the death penalty. The questions asked by the prosecutor were not designed to provoke responses from American-Americans and not other races. And the questions asked by the prosecutor were not designed to elicit disqualifying responses from African-Americans but not other races. There is no indication in the record that the State treated African-Americans differently than it treated other races during voir dire.
Further, Townes does not argue and the record does not indicate that there was any "[d]isparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner." Branch, 526 So.2d at 622-23. There is no indication that the State struck African-Americans for a reason but left an individual of another race to whom that reason applied on the jury. Additionally, there does not appear to be a pattern to the State's use of its peremptory challenges against African-Americans.
Finally, Townes asserts that the Houston County District Attorney's Office has a history of using its peremptory challenges in a discriminatory manner. This factor, however, does not establish an inference of discrimination in this case. As this Court stated in McCray v. State, 88 So.3d 1, 24 (Ala.Crim.App.2010) :
"[T]o the extent that the Houston County District Attorney's Office has a history of racial discrimination, that history is attenuated. 'The opinions reversing the Houston Circuit Court on Batson grounds date from 1991, [almost 24] years ago. The most recent of those opinions was published in 1998, [over 17] years ago.' Floyd [v. State], 190 So.3d 940, 971 [ (Ala.Crim.App.2007) ] (opinion on return to remand) (Welch, J., dissenting). See McCray v. State, 738 So.2d 911, 914 (Ala.Crim.App.1998) (reversing the judgment of the Houston County Circuit Court based on a Batson violation). Accordingly, although the Houston County District Attorney's Office has a history of using its peremptory strikes in an improper manner, this factor, based on the passage of time, does not establish a prima facie case of racial discrimination."
As in McCray, the Houston County District Attorney's Office's distant history of using peremptory challenges improperly to remove African-Americans does not, 17 years later, establish an inference that it currently discriminates based on race.
In sum, the State's number of peremptory strikes against African-Americans does not raise an inference of discrimination. And nothing in the record-from the type and manner of questions asked to the State's use of its strikes-indicates that the State treated African-Americans disparately. Further, defense counsel assured the circuit court that the State had not used its peremptory challenges in a racially discriminatory manner. Based on the record and defense counsel's assurance, this Court cannot say that plain error resulted from the circuit court's failure *471 to sua sponte require the State to give its reasons for striking African-American veniremembers. Therefore, this issue does not entitle Townes to any relief.
V.
Townes next argues that the circuit court improperly granted the State's for-cause challenge to prospective juror J.P. based on J.P.'s opposition to the death penalty. Townes concedes that, during "the judge's general voir dire, J.P. initially indicated that he could not impose the death penalty" and that J.P. informed the circuit court that he could not put his personal opinions aside and recommend a sentence of death. (Townes's brief, at 52-53.) Townes, however, argues that, when questioned individually, J.P. indicated that he could recommend a sentence of death in some circumstances. Therefore, the circuit court erroneously granted the State's challenge to J.P. Townes did not object to the removal of J.P.; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.Crim. P.
It is well settled that:
" 'A trial judge's finding on whether or not a particular juror is biased "is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province." [ Wainwright v.] Witt, 469 U.S. [412] 429, 105 S.Ct. [844] 855 [ (1985) ]. That finding must be accorded proper deference on appeal. Id."A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).' "
Boyle v. State, 154 So.3d 171, 196 (Ala.Crim.App.2013) (quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988) ).
" ' "In a capital case, a prospective juror may not be excluded for cause unless the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." Drew v. Collins, 964 F.2d 411, 416 (5th Cir.1992), cert. denied, 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993) (quotations omitted). "[T]his standard likewise does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." [ Wainwright v.] Witt, 469 U.S. [412,] 425-26, 105 S.Ct. [844,] 852-53 [ (1985) ].' "
Boyle, 154 So.3d at 196-97 (quoting Parr v. Thaler, 481 Fed.App'x 872, 876 (5th Cir.2012) ).
As Townes concedes, during general voir dire, J.P. stated that he could not "under any circumstance recommend a death sentence, [even] if it proved warranted by the facts in this case and the law in this case." (R. 186.) J.P. also stated that he could not "put ... aside ... [his] personal opinions ... regarding capital punishment ... and base [his] decision solely on the evidence as it comes into this courtroom and the law ... and recommend death if it were warranted." (R. 187.) J.P. was later questioned individually, and the following occurred:
"The Court: [J.P.], don't let me put words in your mouth. If I say something wrong; correct me, if I'm wrong. Okay?
"[J.P.]: Okay.
"The Court: During this process, the question was asked regarding capital punishment and your opinion concerning capital punishment. I thought *472 that you informed the Court that you were opposed to capital punishment or penalty and could not recommend it under any circumstance. Is that the situation; is that correct?
"[J.P.]: No. In the case that we have here where it's-I think I wrote on the survey, you know, I could go with capital punishment on something where there's absolutely no doubt, and it's a severe crime, a child killer or, you know, somebody, and there's no doubt. But in this case where he is doing a robbery and somebody gets killed-and I understand the law says it's the same thing-but I have a problem with an accidental death being a death penalty.
"The Court: Okay. Then are you telling me maybe in a situation like 9-11 where they flew into the World Trade Center and thousands were killed, in that you could; but in a case like this, you could not; is that right?
"[J.P.]: Correct.
"The Court: Okay. Could you put aside your own personal views about that, and if it were warranted, make a recommendation of death, if you were convinced beyond a reasonable doubt that the defendant here was guilty of capital murder, and further that the aggravating circumstances outweighed the mitigating circumstances? Could you do that?
"[J.P.]: I don't think I could in this case."
(R. 286-87.)
Based on the foregoing, the circuit court did not abuse its broad discretion by removing prospective juror J.P. for cause. Initially, J.P. indicated that he could not, under any circumstance, impose a sentence of death. When later questioned about his views, J.P. explained that he might be able to recommend a sentence of death in some circumstances, but only if the State proved guilt beyond all doubt. He stated, however, that he could not recommend a sentence of death in this case.
Because J.P. stated that he could not follow the law, no error, much less plain error, resulted from his removal. Therefore, this issue does not entitle Townes to any relief.
VI.
Townes next argues that, during the penalty phase, the State improperly commented on his decision not to testify. To support his argument, Townes points to the following statement by the prosecutor:
"18 years old. He's a cold, calculated, premeditated murderer. Have you seen any remorse? Look at him. He's chewing gum. This is not even serious to him. He's just sitting over there."
(R. 984.) Townes did not object to the prosecutor's comment; therefore, this issue will be reviewed for plain error only.
In Kelley v. State, 246 So.3d 1032 (Ala.Crim.App.2014), reversed on other grounds, Ex parte Kelley, 246 So.3d 1068 (Ala.2015), this Court rejected a similar argument. Specifically, this Court held:
"Kelley first argues that, during the State's rebuttal penalty-phase closing argument, the prosecutor improperly commented on his failure to testify and his presentation of an innocence defense in the guilt phase. To support his argument, Kelley points to the following statements by the prosecutor:
" 'We have been here since Tuesday with testimony and we have seen not one single ounce of remorse from Mr. Kelley. Not one.
" '....'
*473 "(Kelley's brief, at 93.) According to Kelley, the prosecutor's comment that they had not seen a single ounce of remorse was an improper comment on Kelley's failure to testify during the penalty phase. He further argues that the comment relating to his guilt-phase testimony was improper. This Court disagrees.
"[T]he prosecutor's comment relating to his lack of remorse was not a comment on his failure to testify during the penalty phase. Rather, the prosecutor's comment related to Kelley's demeanor during his guilt-phase testimony and throughout the trial. This Court has held that ' "[t]he conduct of the accused [,] the accused's demeanor during the trial[, and the accused's lack of remorse are] proper subject[s] of comment" ' during the penalty phase. Thompson v. State, [153 So.3d 84, 175] (Ala.Crim.App.2012) (quoting Wherry v. State, 402 So.2d 1130, 1133 (Ala.Crim.App.1981) ). See also Ex parte Loggins, 771 So.2d 1093, 1101 (Ala.2000) (holding that 'remorse is ... a proper subject of closing arguments'). Consequently, no error, much less plain error, resulted from the prosecutor's commenting on Kelley's lack of remorse."
Kelley, 246 So.3d at 1061-62.
Similarly, the State's comment on Townes's lack of remorse, his demeanor, and his behavior was not a comment on Townes's decision not to testify. Rather, the State's comment related to Townes's demeanor during the penalty phase, a subject upon which the State may properly comment. Consequently, no error, much less plain error, resulted from the State's comment, and this issue does not entitle Townes to any relief.
VII.
Townes next argues that, during its rebuttal, penalty-phase closing argument, the State improperly condemned his decision not to plead guilty and, instead, to go to trial. To support his argument, Townes points to the following comment by the State:
"I just want you to listen. Poor, poor, pitiful Townes. I want to remind you, good people, that first of all he pled not guilty. He said he didn't do this. And we proved to you and I showed you and told you and asked you could you give me a fair trial as the district attorney in this community based on the law and the evidence. Not sympathy. The Judge has already told you to base your decisions on facts."
(R. 977.) According to Townes, the State's comment sought to have the jury penalize him for not pleading guilty. Townes did not object to the State's comment at trial; therefore, this issue will be reviewed for plain error only.
Assuming, without deciding, that the State improperly mentioned Townes's decision to plead not guilty, any error did not rise to the level of plain error. Rule 45A, Ala. R.App. P. "Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial." Wilson v. State, 142 So.3d 732, 751 (Ala.Crim.App.2010). Thus, " ' "[t]o rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." ' " Ex parte Brown, 11 So.3d 933, 938 (Ala.2008), (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn, Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) ).
Here, the State's rebuttal, penalty-phase closing argument is difficult to follow. Although *474 the State mentioned Townes's decision to plead not guilty, it appears that the State did so in an attempt to convey the message that the State had proved Townes's guilt, not to have the jury penalize Townes for pleading not guilty or to consider Townes's plea as a sentencing factor. Thus, the State was not, as Townes argues, asking the jury to recommend a harsher penalty because he pleaded not guilty.
Further, the circuit court properly instructed the jury on the factors it could consider during the penalty phase and the process of weighing those factors. The circuit court's instructions allowed the jury to consider only three aggravating circumstances and did not permit the jury to consider Townes's decision to plead not guilty in deciding whether to recommend a sentence of death. Hyde v. State, 778 So.2d 199, 228 (Ala.Crim.App.1998) ( "A jury is presumed to follow the instructions given by the trial court." (citing Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994) )).
Because the State did not tell the jury to consider Townes's plea of not guilty when recommending a sentence and because the circuit court's jury instructions precluded the jury from considering Townes's plea when recommending a sentence, there is virtually no probability that the State's comment adversely affected the outcome of the penalty phase. See Ex parte Brown, 11 So.3d at 938. Therefore, any error in the State's comment did not rise to the level of plain error, and this issue does not entitle Townes to any relief.
VIII.
Townes next argues that the State improperly admitted victim-impact evidence in the guilt phase of the trial. In support of his argument, Townes asserts that the State improperly admitted testimony from Martha Rawls, Woods's mother, indicating: 1) that she last spoke with Woods on the Monday before he was murdered and, during their last conversation, Woods and his mother both had said, "I love[ ] you," ( R. 401 ); and 2) that she had to bury her son. Townes also argues that the State improperly had Rawls identify Woods from his autopsy photograph. Finally, Townes argues that, during the guilt-phase opening statements and closing statements, the State improperly commented on the fact that Woods and his mother told each other that they loved one another. According to Townes, Rawls's testimony and the State's comments constituted improper victim-impact testimony and should not have been admitted in the guilt phase of the trial. Thus, Townes asserts that he is entitled to a new trial. Townes did not object to Rawls's testimony or the State's comments at trial; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
"Victim-impact statements typically 'describe the effect of the crime on the victim and his family.' " Turner v. State, 924 So.2d 737, 770 (Ala.Crim.App.2002) (quoting Payne v. Tennessee, 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ). "It is well settled that victim-impact statements 'are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible.' " Jackson v. State, 791 So.2d 979, 1011 (Ala.Crim.App.2000) (quoting Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993), citing in turn Charles W. Gamble, McElroy's Alabama Evidence, § 21.01 (4th ed.1991)). This Court has explained that evidence relating to the discovery of the victim's body is not victim-impact evidence. Turner, 924 So.2d at 769-70. See also *475 Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006) (holding that evidence relating to the discovery of the victim's body did not constitute victim-impact evidence).
Testimony relating to the last time Rawls had heard from Woods, identifying Woods's body from an autopsy photograph, and indicating that Woods had been buried was relevant and admissible to establish the time of death, the identity of the victim, and the corpus delicti of the crime. Consequently, that testimony did not constitute inadmissible victim-impact evidence. Therefore, no error, much less plain error, resulted, and this issue does not entitle Townes to any relief.
Further, assuming without deciding that Rawls's testimony that she and Woods told each other that they loved one another was victim-impact evidence, any error in its admission was harmless. In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the Alabama Supreme Court held:
"We agree with Rieber that Mr. Craig's testimony concerning Ms. Craig's children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See also, Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994) ; Ex parte Parker, 610 So.2d 1181 (Ala.1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993) ; Lawhorn v. State, [581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.1991) ]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) ; and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989) ], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber's attorneys did not object to Mr. Craig's brief references to Ms. Craig's children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig's testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over *476 substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected-that Ms. Craig was not a 'human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991) )."
663 So.2d at 1005-06.
As in Rieber, the jurors in this case did "not leave their common sense at the courthouse door." Id. Instead, they were well aware that Woods was not a " 'human island,' but a unique individual whose murder had inevitably had a profound impact on [his mom]...." Id. Further, the circuit court instructed the jury that the State must prove Townes's guilt beyond a reasonable doubt and that it "must consider all the evidence admitted in this trial without bias, prejudice, or sympathy to either side." (R. 816.)
Consequently, any error in admitting testimony indicating that Woods and his mother said they loved each other was harmless and did not rise to the level of plain error. Therefore, this issue does not entitle Townes to any relief.
IX.
Townes next argues that the State improperly injected victim-impact evidence into the guilt phase of the trial when it admitted evidence and made comments relating to the pain Townes and Benton caused Woods. Townes also argues that the State improperly admitted autopsy photographs. Townes did not raise these arguments at trial; therefore, these issues will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
Townes argues that the State improperly elicited testimony showing that Woods felt pain during Townes's crime. He also argues that the State improperly commented on the pain Woods felt during the crime. In McCray v. State, 88 So.3d 1, 38 (Ala.Crim.App.2010), this Court rejected the premise underlying Townes's argument-that the pain a capital-murder victim suffers is irrelevant and that evidence of it is inadmissible during the guilt phase of a capital-murder trial. Specifically, this Court held that "[t]he pain and suffering of the victim is a circumstance surrounding the murder-a circumstance that is relevant and admissible during the guilt phase of a capital trial." Id. (citing Smith v. State, 795 So.2d 788, 812 (Ala.Crim.App.2000) (no error in trial court's questioning witness regarding the number of wounds on the murder victim's body during guilt phase of capital-murder trial despite appellant's argument that the number of wounds was relevant only to the penalty-phase issue of whether the murder was especially heinous, atrocious, or cruel)). See also Wilson v. State, 142 So.3d 732, 773-74 (Ala.Crim.App.2010) (same).
More importantly, victim-impact statements typically "describe [only] the effect of the crime on the victim and his family" and, although relevant to the penalty-phase, are inadmissible in the guilt-phase. Payne v. Tennessee, 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, statements relating to the effect of the crime on the victim "are admissible during the guilt phase of a criminal trial ... if the statements are relevant to a material issue of the guilt phase." Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993) ; see also Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006) (holding that victim-impact type evidence is admissible *477 in the guilt phase if it is relevant to guilt-phase issues). Rule 401, Ala. R. Evid., provides that " '[r]elevant evidence' [is any] evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
Here, the State's theory of the case was that Townes and Benton broke into Woods's house, attacked Woods, and tortured him in an attempt to force Woods to relinquish his property. The pain Townes and Benton caused Woods was relevant and admissible to show the force they used against Woods to coerce him to give Townes and Benton his property. Consequently, no error, much less plain error, resulted in the admission of evidence relating to Woods's pain or the State's comment on Woods's pain. Rule 45A, Ala. R.App. P.
Townes also argues that the State improperly admitted autopsy photographs he believes were irrelevant and overly gruesome. Alabama courts have long recognized that photographs depicting the wounds of the victim are relevant and admissible. See Stallworth v. State, 868 So.2d 1128, 1151 (Ala.Crim.App.2001) ("The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative." (citations and quotations omitted)); Ward v. State, 814 So.2d 899, 906 (Ala.Crim.App.2000) ("The same rule applies to videotapes [that applies to] photographs." (citations and quotations omitted)). In Brooks v. State, 973 So.2d 380 (Ala.Crim.App.2007), this Court explained:
" 'Generally, photographs are admissible into evidence in a criminal prosecution "if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge." ' Bankhead v. State, 585 So.2d 97, 109(Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986). 'Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.' Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, 'photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). 'This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries.' Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ' "[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter." ' Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953 (2002), on remand to, 851 So.2d 453 (Ala.2002)."
Brooks, 973 So.2d at 393.
This Court has reviewed the autopsy photographs and holds that they were relevant and admissible to show the extent of Woods's injuries and his cause of death.
*478 The photographs depicting the extent of Woods's injuries were particularly relevant given the State's theory that Townes and Benton tortured Woods as part of the burglary. Further, the photographs were not unduly gruesome. Therefore, the circuit court did not commit any error, much less plain error, in allowing the photographs to be admitted at trial. Rule 45A, Ala. R.App. P. Consequently, this issue does not entitle Woods to any relief.
X.
Townes next argues that the circuit court's jury instruction regarding the distinction between capital murder and felony murder was erroneous. To support his argument, Townes points to the following portion of the circuit court's jury instructions: "And what's the difference between capital murder and felony murder? An intentional killing." (R. 832.) According to Townes, instructing the jury that an intentional killing distinguishes capital murder from felony murder failed to inform the jury that Townes had to have the specific intent to kill and allowed the jury to convict him of capital murder based on his accomplice's intent. Townes did not object to the circuit court's instruction; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
Townes's argument that the circuit court's jury instructions allowed the jury to find him guilty of capital murder without finding that he had the specific intent to kill is refuted by the record and is without merit. See Wilson v. State, 142 So.3d 732, 806 (Ala.Crim.App.2010) (recognizing that a claim that is refuted by the record is without merit and does not entitle the appellant to relief). During its instructions on the elements of capital murder, the circuit court informed the jury that to find Townes guilty of capital murder, it had to find that he "intended to kill [Woods]." (R. 820.) The circuit court instructed the jury:
"[A] person acts intentionally when it is his purpose to cause that death-cause the death of another person. The intent to kill must be real and specific.... [So the State must prove] that in committing the act which caused the death of Christopher Woods, the defendant intended to kill the deceased."
(R. 821.) The circuit court later detailed specific intent, again instructing the jury that "capital murder requires a specific intent, a specific intent to kill." (R. 823.) The circuit court then instructed the jury:
"Intention in regard to murder should mean that a person acted intentionally with respect to a particular result, that is, death. The defendant must intentionally, as opposed to negligently or accidentally or recklessly, cause the death of the deceased in order to invoke the capital murder statute. The fact that someone dies or is killed during the course of a burglary does not automatically prove the intent. The intent to kill must be real and specific in order to invoke the capital murder statute."
(R. 823-24.) The circuit court informed the jury that it may infer intent from the facts surrounding the crime "[b]ut the facts upon which such inference is drawn must be proved so clearly as to leave no reasonable doubt in the minds of the jury that on the occasion complained of, the defendant intended to kill Christopher Woods." (R. 824.) (Emphasis added.) The circuit court also informed the jury that "[t]he burden of proof remains with the State to prove beyond a reasonable doubt that the defendant had the requisite intent." (R. 825.)
Here, the circuit court repeatedly instructed the jury that to find Townes guilty of capital murder, the jury must find that Townes had the specific intent to kill *479 Woods. Instructing the jury about the difference between capital murder and felony murder did not, as Townes believes, nullify the circuit court's capital-murder instruction requiring the jury to find that Townes had the specific intent to kill. Because the circuit court repeatedly instructed the jury that it could not find Townes guilty of capital murder unless the State proved that Townes had the specific intent to kill, this issue is refuted by the record and does not rise to the level of plain error. Wilson, 142 So.3d at 806. Therefore, this issue does not entitle Townes to any relief.
XI.
Townes next argues that his trial counsel had a conflict of interest because counsel had previously represented Woods, the victim, in an unrelated matter. According to Townes:
"Prior to trial, defense counsel notified the trial court that he represented the victim, Christopher Woods, at the time of the alleged murder. (C. 94-5.) The judge never questioned defense counsel about his representation of the victim, nor did the judge question Mr. Townes to determine whether he knowingly and voluntarily waived his Sixth Amendment protection from conflicted counsel....
"The trial court's failure to inquire into the conflict and determine whether Mr. Townes waived his right to conflict-free representation violated Mr. Townes's right to effective assistance of counsel and his rights to due process, equal protection, and a fair trial as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law."
(Townes's brief, at 74-75). Townes did not raise this argument at trial; therefore, this Court will review this issue for plain error only. Rule 45A, Ala. R.App. P.
Prior to trial, defense counsel filed the following notice:
"Tawuan Townes respectfully places both the Court and the state on notice of the following:
"1. At the time of the alleged offense, the undersigned counsel represented the victim, who was awaiting a probation hearing for a drug charge,
"2. When counsel realized his relationship with the victim, he contacted the General Counsel's Office of the Alabama State Bar.
"3. Based on discussions with the General Counsel and the fact that counsel learned no confidential information that could be used for or against this defendant, or for or against the state, the General Counsel stated that counsel could proceed with the representation upon notice to the Court and state and with [Townes's] consent.
"4. [Townes] has consented to this representation."
(C. 94.) Before trial, the circuit court inquired about the notice as follows:
"The Court: ... You checked with the bar, correct?
"[Counsel]: Yes, sir. As soon as I found out the alleged victim here was Christopher Woods. I didn't learn anything in representing Mr. Woods that would have any impact on this case pending probation hearing for a drug possession case, and other than minimal contact with him to handle the cases, I was advised to handle it. There was not anything else that could be used here."
(R. 42-43.)
In Strouse v. Leonardo, 928 F.2d 548, 552 (2d Cir.1991), the United States Court of Appeals for the Second Circuit rejected *480 the argument that an attorney had a conflict of interest because that attorney represented a defendant charged with murder and had represented the victim in an unrelated matter. Specifically, the Second Circuit held:
"It is well established that the Sixth Amendment right to effective assistance of counsel carries with it 'a correlative right to representation that is free from conflicts of interest.' Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981)....
"In Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court articulated the standard for assessing ineffective assistance of counsel claims based on conflict of interest: 'In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance.' Id. at 350, 100 S.Ct. at 1719. Thus, the mere possibility of a conflict is not enough to upset a conviction; the defendant must identify an actual conflict that impeded his lawyer's representation. Id.; United States v. Jones, 900 F.2d 512, 519 (2d Cir.), cert. denied, 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990). We believe that Strouse has not satisfied this burden thus far.
"Strouse's claim that Cally's prior representation of Mrs. Strouse gave rise to a conflict of interest in his representation of Strouse is without merit. Cally's work for Mrs. Strouse, in addition to drafting her will, consisted of occasional real estate work and handling small matters relating to her divorce. We can discern no way in which this prior work for Mrs. Strouse created a conflict in Cally's representation of Strouse at his murder trial. See, e.g., Kirkpatrick v. Butler, 870 F.2d 276, 284 (5th Cir.1989) (no conflict where defense counsel had friendship with and had in the past represented members of murder victim's family), cert. denied, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990) ; Crisp v. Duckworth, 743 F.2d 580, 588 (7th Cir.1984) (no conflict where defense counsel represented murder victim in unrelated criminal action and informed defendant of the prior representation), cert. denied, 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985). Moreover, as one court has pointed out, such representation may, under some circumstances, be desirable. See Kirkpatrick, 870 F.2d at 284. Strouse could well have thought that the jury would look favorably upon his choosing his mother's lawyer to defend him."
Strouse, 928 F.2d at 552-53. See also Moseley v. Scully, 908 F.Supp. 1120, 1138-39 (E.D.N.Y.1995) (same); People v. Burnside, 132 Ill.App.3d 826, 827-28, 87 Ill.Dec. 719, 477 N.E.2d 845, 846 (1985) (same).
Here, Townes's attorney had represented the victim, Woods, in matters unrelated to the crime for which Townes was on trial. During his representation of Woods, counsel did not learn any information that would be used for or against Townes. Under these circumstance, Townes has not shown that defense counsel suffered under a conflict of interest. Further, he has failed to show any indication that defense counsel's representation was affected by the alleged conflict.
Consequently, Townes has not established that any error, much less plain error, resulted from defense counsel's representation of Woods. Therefore, this issue does not entitle Townes to any relief.
XII.
Townes next argues that the State improperly insinuated that defense counsel engaged in unethical behavior. According *481 to Townes, the State elicited testimony from Starks that Woods had been drinking a Powerade brand sports drink mixed with a solution to clean drugs from his system before going to see his probation officer. The State also elicited testimony that defense counsel represented Woods. According to Townes, testimony indicating that Woods was concealing his drug use from his probation officer coupled with testimony that defense counsel represented Woods insinuated that defense counsel participated in or condoned Woods's illegal behavior. Townes then surmises that "the State intentionally undermined the credibility of [his] attorney"; therefore, he is entitled to a new trial. (R. 76.) Townes did not raise this argument at trial; therefore, this Court will review this issue for plain error only. Rule 45A, Ala. R.App. P.
During the State's direct examination of Starks, the following occurred:
"Q. Now, would you tell the ladies and gentlemen of the jury, when Chris came home sometime after one o'clock, was Chris drinking anything or did he start drinking anything shortly inside?
"A. Yes.
"Q. What kind of drink did he start drinking?
"A. It was Powerade mixed with a solution that's supposed to clean your system for when you have to go and take a drug test, because he had to go meet with his probation officer that day.
"Q. Do you know who represented Chris?
"A. The defendant's attorney, if I'm not mistaken."
(R. 428-29.)
To rise to the level of plain error, the alleged error "must be obvious on the face of the record." Ex parte Walker, 972 So.2d 737, 753 (Ala.2007). Only an error that is " 'so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings,' " rises to the level of plain error. Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981) ). See also Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (holding that appellate courts should not reverse a conviction or sentence under the plain-error doctrine unless the error is so "egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings" (citing Kuenzel v. State, 577 So.2d 474, 481-82 (Ala.Crim.App.1990) )). If the propriety, legality, or correctness of a claimed error is "subject to reasonable dispute," then the appellant cannot establish plain error. Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (holding that appellate courts cannot find plain error unless "the [alleged] legal error [is] clear or obvious, rather than subject to reasonable dispute" (citing United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) )).
Here, there is no indication in the record that the prosecutor was trying to imply that defense counsel participated in or condoned Woods's attempt to conceal his drug usage. In fact, the record is devoid of any indication that defense counsel was aware at the time he represented Woods that Woods was using drugs. The record likewise contains no indication that defense counsel was aware that Woods was attempting to conceal his drug usage. To accept Townes's argument, this Court must presume that jurors believe that defense attorneys are aware of, participate in, or condone all the conduct of their clients. Under plain-error review, this Court cannot make that presumption.
*482 Rather, under plain-error review, an alleged error "must be obvious on the face of the record." Walker, 972 So.2d at 753.
Because Townes's argument that "the State intentionally undermined the credibility of [his] attorney," (R. 76), is not "obvious on the face of the record," Walker, 972 So.2d at 753, this Court cannot say that plain error occurred. Consequently, this issue does not entitle Townes to any relief.
XIII.
Townes next argues that the State improperly introduced evidence establishing his street-gang membership in violation of Rule 404(b), Ala. R. Evid. According to Townes, the prosecutor elicited testimony establishing that a blue shirt was seized from him and that people on the west side of Dothan often wear blue. From there, Townes surmises that people on the west side of Dothan are members of the "Crips" street gang. Thus, the prosecutor presented evidence establishing that Townes was a member of a street gang. Townes did not object at trial; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
As discussed in the preceding section of this opinion, to rise to the level of plain error, the alleged error "must be obvious on the face of the record." Ex parte Walker, 972 So.2d at 753. Only an error that is "so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings," rises to the level of plain error. Ex parte Womack, 435 So.2d at 769 (quoting Chaney, 662 F.2d at 1152 ). See also Ex parte Price, 725 So.2d at 1071-72 (holding that appellate courts should not reverse a conviction or sentence under the plain-error doctrine unless the error is so "egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings"). If the propriety, legality, or correctness of a claimed error is "subject to reasonable dispute," then the appellant cannot establish plain error. Puckett, 556 U.S. at 135 (holding that appellate courts cannot find plain error unless "the [alleged] legal error [is] clear or obvious, rather than subject to reasonable dispute" (citing Olano, 507 U.S. at 734 )).
Here, the record does not establish that the prosecutor presented any evidence or arguments establishing that Townes was a member of a gang. The prosecutor presented evidence indicating that Townes had blue clothes and that blue clothes are worn more often by people who live on the west side of Dothan. The prosecutor did not present any evidence indicating that people who live on the west side of Dothan are gang members or are members of the Crips street gang. Rather, to argue that the prosecutor presented evidence of his gang membership, Townes surmises, without any evidence in the record, that people on the west side of Dothan are members of the Crips street gang.
Because Townes's argument is based on conjecture that is not clearly established by the record, the alleged error is not "obvious on the face of the record," Walker, 972 So.2d at 753, and does not rise to the level of plain error. Rule 45A, Ala. R.App. P. Therefore, this issue does not entitle Townes to any relief.
XIV.
Townes next argues that the State improperly admitted evidence that he was in possession of a bag of marijuana when he was arrested. According to Townes, the fact that he had a bag of marijuana in his pocket when he was arrested 14 hours after Woods's murder was irrelevant to the crime for which he was being tried. Therefore, the State admitted evidence regarding *483 his possession of marijuana to show that he had bad character in violation of Rule 404(b), Ala. R. Evid. Townes further argues that the circuit court failed to give a limiting instruction regarding how the jury should consider the fact that he possessed marijuana; therefore, he is entitled to a new trial. The State, on the other hand, argues that Townes admitted that he went to rob Woods because Woods was a drug dealer; therefore, evidence that Townes possessed marijuana shortly after Woods's murder was relevant to show motive. The State also argues that the circuit court did not err by failing to give the jury a limiting instruction because the collateral-bad-act evidence did not involve a conviction.
At trial, the State presented evidence indicating that Woods had marijuana in his house. (R. 792.) Because the bag of marijuana was found in a pocket of the same pair of Townes's pants in which the SIM card from Starks's cellular telephone was found, the State and the circuit court believed that the bag of marijuana was proceeds of the burglary. The State presented evidence relating to the marijuana as if it was proceeds of the burglary. (R. 769.) Townes, however, argues that the bag of marijuana was not proceeds of the burglary; therefore, its admission was improper.
This Court need not decide whether the State proved that the bag of marijuana was proceeds of the burglary, rendering it admissible, or whether the failure to give a limiting instruction was error because, even if they were errors, those "error[s] did not affect the outcome of the proceeding and, thus, w[ere] harmless." Riley v. State, 166 So.3d 705, 721 (Ala.Crim.App.2013) (citing Rule 45, Ala. R.App. P.); see also Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999) ("The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless." (citing Arizona v. Fulminante, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) )). In his statement Townes admitted that he went to Woods's house to rob him because Woods was a drug dealer who had just received two ounces of "dope." (C. 503.) Townes did not deny that he went to Woods's house to steal money and drugs. In his opening statement, defense counsel conceded that Townes went to Woods's house to rob him because Townes knew Woods was a drug dealer who had money and drugs. Townes's motive to commit the crime-money and drugs-was not at issue. Thus, presenting evidence indicating that Townes had a bag of marijuana that he acquired during the burglary was harmless. See Riley v. State, 166 So.3d at 721 (holding that the improper admission of evidence indicating that the defendant has a propensity to commit robbery was harmless when the defendant admitted to robbing the victim but denied that he intended to kill the victim). Further, because Townes's possession of the bag of marijuana was presented as substantive evidence of guilt relating to an uncontested fact-his participation in the burglary-any error in failing to give a limiting instruction was also harmless. See id.; see also Johnson v. State, 120 So.3d 1119, 1130 (Ala.2006) (holding that circuit courts are not required to give sua sponte a limiting instruction when evidence of collateral bad acts is admitted as substantive evidence of guilt); Key v. State, 891 So.2d 353, 366-67 (Ala.Crim.App.2002) (holding that the circuit court was not required to give sua sponte a limiting instruction regarding evidence of Key's prior conviction because the prior conviction was admitted to show motive as opposed to impeachment); Dotch v. State, 67 So.3d 936, 969-70 (Ala.Crim.App.2010) (holding that the circuit court was not required to instruct the jury regarding *484 its consideration of prior conviction evidence when that evidence had been admitted to establish motive).
Because evidence indicating that Townes had a bag of marijuana as proceeds of the burglary was admitted to prove an uncontested fact, any error in its admission and in the failure to give a limiting instruction was harmless. See Riley, 166 So.3d at 721. Therefore, this issue does not entitle Townes to any relief.
XV.
Townes next asserts that, during the penalty-phase closing arguments, the State improperly "argued that Biblical teachings, as laid out in the Ten Commandments and the Old Testament, required a death sentence." (Townes's brief, at 81.) According to Townes, "[t]he prosecutor's argument directed the jury to disregard Alabama Law in favor of Biblical Code." (Townes's brief, at 82.) Townes concludes that the State's argument violated his rights and entitles him to a new sentencing proceeding. Townes did not object to the State's comment at trial; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
During the penalty-phase closing arguments, the following occurred:
"[Defense counsel:] I'm going to start with a quote from Archbishop Desmond Tutu.
"[The State]: I object. A quote from an archbishop?
"The Court: Overruled.
"[Defense counsel]: He said to take a life when a life has been taken is vengeance not justice. And that's what [the prosecutor] and the State are seeking."
(R. 964-65.) The State responded to defense counsel's argument as follows:
"And [defense counsel] says, [i]t's vengeance, it's not justice. Well, the Good Book says in the commandment, [y]ou shall not kill. It's pretty simple. It's not difficult. Whoever smiteth the man with iron should he himself be smited. That's what it says in the Book. I'm not going to comment about a bishop from another place. This is your community. Your community."
(R. 988.)
It is well settled that "[a] prosecutor has the right to 'reply in kind' to statements made by defense counsel in the defense's closing argument." Newton v. State, 78 So.3d 458, 478 (Ala.Crim.App.2009) (citations and quotations omitted.) "This 'reply-in-kind' doctrine is based on fundamental fairness." Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999) (citing Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala.1984) ). " 'When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.' " Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App.1986) (quoting DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469-70 (1982-83). Thus, "[a] prosecutor has a right based on fundamental fairness to reply in kind to" defense counsel's "Biblical argument." Minor v. State, 914 So.2d 372, 428 (Ala.Crim.App.2004) (citations and quotations omitted).
Defense counsel invoked the teachings of Archbishop Desmond Tutu to argue against the imposition of a sentence of death. Under the reply-in-kind doctrine, the prosecutor had the right to argue that a recommendation of death would not offend the Bible or the teachings contained therein. Because the prosecutor was properly replying in kind to defense counsel's religion-based argument, no error, much less plain error, occurred.
*485 Therefore, this issue does not entitle Townes to any relief.
XVI.
Townes next argues that the State, in its rebuttal closing argument in the penalty phase, made "an improper gender-based argument to shame the jury into voting for the death penalty." (Townes's brief, at 83.) According to Townes, the State's reliance on a gender-based argument entitles him to a new penalty-phase hearing. Townes did not object to the State's comment; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
During the State's penalty-phase, rebuttal closing argument, the prosecutor sought to emphasize the brutality of the murder by encouraging the jury to look at the pictures of the body. While the State was emphasizing the brutality of the murder, the following occurred:
"Don't forget looking at those pictures. I asked you on voir dire, once again, do you have the courage to do what's right. I gave you the opportunity, ladies and gentlemen-and one of my assistants said, [y]ou won't get no death penalty, you have too many women. I said, I don't believe it. I believe this jury is smart enough to look at the law and follow the evidence and do what's right. Have the courage in your community from the law and the facts. He says I can't disprove their mitigating circumstances. Namby-pamby bunch of crap is all that was."
(R. 983-84.)
Regarding comments made during closing arguments, this Court has repeatedly explained:
" ' "In judging a prosecutor's closing argument, the standard is whether the argument 'so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process.' " Bankhead [v. State ], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2] 8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead, 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.'
" Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). Moreover, ' "[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." '
*486 Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985) )."
Wilson v. State, 142 So.3d 732, 776 (Ala.Crim.App.2010) (opinion on return to remand).
Here, the prosecutor's argument implies that women are more lenient than men in the penalty phase of a capital-murder trial. Thus, the prosecutor's "comment[ ] suggesting that ... woman [are more lenient] w[as] improper because [it related to] stereotypic notions of gender behavior." State v. Lopez, 359 N.J.Super. 222, 239, 819 A.2d 486, 496 (App.Div.2003). However, the prosecutor's comment did not rise to the level of plain error. The comment was isolated and part of a disjointed argument. See Romine v. Head, 253 F.3d 1349, 1369 (11th Cir.2001) (" '[I]solated, or ambiguous or unintentional remarks must be viewed with lenity,' Brooks [v. Kemp], 762 F.2d [1383,] 1400 [ (11th Cir.1985) ], and a brief remark is less likely to cause prejudice. Id. at 1415."); Mitchell v. State, 84 So.3d 968, 984 (Ala.Crim.App.2010) (recognizing that an isolated, improper comment is less likely to be prejudicial). The comment did not encourage the jury to recommend a sentence of death on an improper basis, but encouraged the jurors to look at the facts, follow the law, and "do what's right." (R. 984.) This Court cannot say that the prosecutor's comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Minor, 914 So.2d at 415. Consequently, "the prosecutor's remarks were not so highly prejudicial or grossly improper as to constitute plain error," McCall v. State, 501 So.2d 496, 507 (Ala.Crim.App.1986), and this issue does not entitled Townes to any relief.
XVII.
Townes next argues that when the circuit court sentenced him to death, it failed to accord his age at the time of the offense-18-sufficient weight as a mitigating circumstance. According to Townes, the circuit court considered his age as a mitigating circumstance and gave that circumstance "some weight"; however, it did not give Townes's age "substantial weight." (Townes's brief, at 85.) Townes argues that, because the circuit court did not give his age substantial weight, his sentence of death should be reversed.
This Court addressed a similar argument in Riley v. State, 166 So.3d 705 (Ala.Crim.App.2013). In Riley, this Court explained:
" ' "[I]n keeping with the dictates of the United States Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Crim.App.1983), rev'd on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances *487 is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation."
" ' Ex parte Clisby, 456 So.2d 105, 108-09 (Ala.1984), cert. denied, Clisby v. Alabama, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985).'
" Morris v. State, 60 So.3d 326, 351 (Ala.Crim.App.2010). See also Haney v. State, 603 So.2d 368, 389 (Ala.Crim.App.1991) ('It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.') (citing Cochran v. State, 500 So.2d 1161 (Ala.Crim.App.1984), aff'd in pertinent part, remanded on other grounds, 500 So.2d 1179 (Ala.1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Crim.App.), aff'd, 500 So.2d 1064 (Ala.1986) ))."
Riley, 166 So.3d at 727-28. See also White v. State, 179 So.3d 170 (Ala.Crim.App.2013).
In the instant case, the circuit court found Townes's age at the time of the offense to be a mitigating circumstance. The weight to be assigned that mitigating circumstance is completely within the circuit court's discretion. Id. Nothing in the record indicates that the circuit court abused its discretion in weighing this circumstance; therefore, this issue does not entitle Townes to any relief.
XVIII.
Townes also argues that the circuit court erroneously relied on an incomplete presentence report. Specifically, Townes argues that the presentence report was incomplete and, therefore, hampered the circuit court's sentencing decision. Townes also asserts that the presentence report was based on information collected two and a half years before his sentencing and was internally inconsistent. He further argues that some of the information in the report conflicted with mitigating evidence that he presented at his sentencing hearing.
In its sentencing order, the circuit court explained:
"The Court ordered and received a written pre-sentence report, which was made available to the Defendant and the State. The Defendant objected to the presentence report. The Court directed that a new report be prepared and continued sentencing to June 10, 2011."[3]
(C. 318.) The new presentence report was completed June 8, 2011. Defense counsel received a copy of the new presentence report and objected to the inclusion of a possession of marijuana charge. Defense counsel, however, did not object to the completeness of the new report or any inaccuracies in the new report. Accordingly, this Court reviews these issues for plain error only. Rule 45A, Ala. R.App. P.
Townes, relying on the Alabama Supreme Court's decision in Ex parte Washington, 106 So.3d 441 (Ala.2011), and § 13A-5-47(b), Ala.Code 1975, argues that the presentence report was incomplete and was based on information collected two and a half years before his sentencing, which hampered the circuit court's sentencing decision. This Court disagrees.
In Ex parte Washington, the Alabama Supreme Court, relying on this Court's decision in *488 Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), held that the circuit court's reliance on an incomplete presentence report was error. Washington, 106 So.3d at 450. In Washington, the circuit court relied, in part, on the lack of information in the incomplete presentence report "in not finding the existence of any nonstatutory mitigating circumstances and, ultimately, in deciding that death was the appropriate sentence in this case." Washington, 106 So.3d at 450. Thus, "[i]t appear[ed] likely that the deficiencies in the report may indeed have 'hamstrung the trial court in considering the full mosaic of [Washington's] background and circumstances.' " Washington, 106 So.3d at 450 (quoting Guthrie, 689 So.2d at 947 ).
In Wilson v. State, 142 So.3d 732 (Ala.Crim.App.2010), this Court addressed a similar challenge to the adequacy of a defendant's presentence-investigation report, stating:
"In support of his argument, Wilson relies on Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), in which this Court reversed Guthrie's sentence based on an insufficient presentence-investigation report. Specifically, this Court took issue with the lack of recent information in Guthrie's personal- and social-history section of the report, and its lack of any information in Guthrie's evaluation-of-offender section. In Guthrie, this Court held:
" 'This presentence report's cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court's consideration of the full mosaic of Guthrie's background and circumstances before determining the proper sentence. As such, this presentence report risked foiling the purpose of § 13A-5-47(b)[, Ala.Code 1975 ]. We find that the insufficiency of this report requires a remand for the trial court to reconsider Guthrie's sentence with a sufficient presentence report.'
"689 So.2d at 94[7].
"In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), this Court distinguished Guthrie, stating:
" 'In support of his argument, Jackson relies on Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in which this court reversed Guthrie's sentence and remanded the case for the trial court "to reconsider Guthrie's sentence with a sufficient presentence report." 689 So.2d at 947....
" ' "...."
" '... "The purpose of the presentence investigation report is to aid the sentencing judge in determining whether the jury's advisory verdict is proper and if not, what the appropriate sentence should be." Ex parte Hart, 612 So.2d 536, 539 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
" 'Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the "full mosaic of [Jackson's] background and circumstances" before sentencing him. In Guthrie, we were concerned with the cursory presentence report because Guthrie had not presented any mitigating evidence during the sentencing hearings before the jury or the trial court and specifically instructed his attorney not to argue any mitigation other than the fact that his role in the crime was as an accomplice; because Guthrie's personal and social history contained in the report had been taken from an interview that was conducted at least five years before his sentencing hearing and no attempt *489 had been made to update that information for purposes of the presentence investigation; and because, although the report indicated that no psychological reports were available, the record showed that Guthrie had been incarcerated at Taylor Hardin Secure Medical Facility in 1988.
" 'Although we agree with Jackson that the presentence report in this case was virtually identical to the youthful offender report prepared over a year before Jackson's trial, ... we find that the deficiency in the report in this case does not cause the same problem as the deficiency in Guthrie.
" 'In Guthrie, the court was faced with sentencing Guthrie without any current information on his background. Here, however, Jackson presented extensive mitigating evidence about his background and childhood, at both the sentencing hearing before the jury and before the trial court. In addition, the trial court had before it both Dr. Goff's and Dr. Smith's psychological evaluations containing extensive information about Jackson's life, his schooling, and his mental history. Finally, the trial court indicated in its sentencing order that it had considered this mitigating evidence in reaching its decision. Clearly, the trial court here was not "hamstrung" into determining Jackson's sentence without consideration of "the full mosaic" of Jackson's background and circumstances. See, e.g., Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999). Therefore, we find no error, plain or otherwise, as to this claim.'
" 791 So.2d at 1033-34. See also Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001) ; Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000).
"As in Jackson, the circuit court here was presented with 'the full mosaic' of Wilson's background and circumstances. During the penalty phase, Wilson presented testimony from his mother, who testified at length about Wilson's childhood, and from a childhood neighbor, who testified about Wilson's willingness to aid her in her capacity as a disaster-relief worker. See Ex parte Washington, [106 So.3d 441, 450] (Ala.2011) (expressly refusing to hold that 'the adequacy of the presentence report should be evaluated in isolation'). In addition, the reports that Wilson complains should have been part of the presentence-investigation report-the competency-exam report and the youthful-offender-investigation report-were, in fact, part of the circuit court's file and are part of the record on appeal. (C. 29, 47-53; 1st Supp. C. 18-24.)
"Because Wilson presented mitigation testimony during the penalty phase and the circuit court had access to the reports that were not referenced in the presentence-investigation report, this Court holds that any inadequacy in the presentence-investigation report did not constitute plain error. Rule 45A, Ala. R.App. P.; Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008) (concluding there was 'no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information'). Accordingly, this issue does not entitle Wilson to any relief."
Wilson, 142 So.3d at 799-800.
Similarly, the record indicates that the circuit court carefully considered "the full mosaic of [Townes's] background and circumstances before determining the proper sentence." Guthrie, 689 So.2d at 947. Townes presented extensive mitigating evidence from his mother, father, Beverly *490 Harris, and Dr. David Ghostly, a clinical psychologist specializing in forensic psychology. Townes presented extensive evidence relating to his childhood, home life, circumstances, and mental-health issues. Further, Townes was evaluated by Dr. Doug McKeown, a clinical and forensic psychologist. Dr. McKeown's psychological-evaluation report was attached to the presentence report. Additionally, the presentence report contained information from a character witness, Ms. Wimberly, who described Townes as a good, respectful, courteous young man. Ms. Wimberly explained that she attended Bible study with Townes. She stated that Townes did not have a stable home life and that he moved between group homes and relatives. Townes also lived with Ms. Wimberly after he was released from a group home. Ms. Wimberly also stated that she had never known Townes to be violent and did not think that he deserved to be sentenced to death.
The circuit court's sentencing order establishes that it considered all of Townes's mitigating evidence and had before it a "full mosaic of [Townes]'s background and circumstances," Guthrie, 689 So.2d at 947, and that it carefully considered those circumstances before sentencing Townes to death. Because Townes presented extensive mitigation, any inadequacy in the presentence report did not constitute plain error. Rule 45A, Ala. R.App. P. See Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008) (concluding there was "no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information"). Consequently, this issue does not entitle Townes to any relief.
Townes next argues that the information contained in the report was inaccurate because it conflicted with mitigation evidence that he presented during the penalty phase of his trial. Specifically, he alleges that the report states that he had a good relationship with his father when, according to Townes, his father abandoned him when he was a child.
In Calhoun v. State, 932 So.2d 923, 977 (Ala.Crim.App.2005), this Court rejected a similar argument. Calhoun argued that the presentence report contained inaccuracies; therefore, he was entitled to be resentenced by the judge. This Court rejected Calhoun's argument:
"Here, the circuit court's sentencing order clearly states that each party was given a copy of the presentence report, yet Calhoun never challenged any inaccuracies in the report. Section 13A-5-47(d), Ala.Code 1975, specifically provides that the circuit court must make 'written findings of facts summarizing the crime and the defendant's participation in it.' The findings made by the circuit court were clearly based on the evidence presented during the trial, and they did not contain any of the inaccuracies that Calhoun challenges in the presentence report.
"Moreover, Calhoun cites nothing in the circuit court's order that would indicate that the court relied on the now-challenged contents of the presentence report. As this Court stated in Kuenzel v. State, 577 So.2d 474, 528 (Ala.Crim.App.1990), aff'd 577 So.2d 531 (Ala.1991), quoting United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989) :
" ' "When, as in this case, the defendant claims that his due process rights were violated by the sentencing court's reliance on materially false information, the defendant must establish not only that the disputed information is materially false or unreliable, but also that the sentencing judge relied on the information." ' "
*491 Calhoun, 932 So.2d at 977. This Court then noted that the circuit court's sentencing order established that it relied on the evidence presented at trial as opposed to the inaccurate presentence report; therefore, the inaccuracies were harmless.
Similarly, defense counsel was provided a copy of the presentence report. Townes has not pointed to any portion of record that he believes establishes that the circuit court relied on inaccurate information contained in the presentence report. Further, the circuit court's sentencing order establishes that it relied on the evidence presented during the penalty phase and sentencing hearing as opposed to the presentence report. When describing the nonstatutory mitigating circumstances it considered, the circuit court detailed the mitigating evidence Townes presented. The circuit court specifically found that Townes's "father left when Tawuan was about 4 years old." There is no indication that the circuit court relied on any inaccurate information.
Because the circuit court relied on the evidence Townes presented as opposed to any inaccurate information contained in the presentence report, this issue does not rise to the level of plain error. Rule 45A, Ala. R.App. P. Therefore, it does not entitle Townes to any relief.
XIX.
Townes next argues that the State violated the circuit court's discovery order by failing to turn over to the defense recorded conversations between Townes and Beverly Harris. This Court disagrees.
During the penalty phase, Townes presented testimony from Harris. The State sought to cross-examine Harris regarding conversations she had with Townes while he was incarcerated. While questioning Harris about her conversations with Townes, the State, on multiple occasions, sought to use recordings of those conversations. On each occasion, Townes objected to the State's use of the recordings on the ground that the recordings had not been provided in discovery. The circuit court sustained each of Townes's objections.
After the State again sought to use the recording of one of the conversations, the circuit court ordered the parties to approach the bench. It then questioned the State regarding why it had not provided the recordings to the defense. The State asserted that it had not disclosed the recordings because Harris was not a State's witness and the recordings were to be used only to impeach her. The Court then ordered the State to turn the recordings over to defense counsel. Defense counsel asked for and was given a recess to listen to the recordings.
After listening to the recordings, defense counsel objected to the State's use of recordings, arguing that the State sought to use what Townes said on the recording in support of nonstatutory aggravating circumstances. The State argued that it sought to use the recordings for, among other reasons, impeaching Harris with what she had said to Townes.
After considering the arguments, the circuit court ruled that the State could not play the recordings in front of the jury and could not ask Harris about statements Townes had made to her. It further ruled that the State could ask Harris about her prior statements-those statements contained in the recording-if the statements she made showed bias or could be used to impeach her.
This Court has explained:
"[W]e view any failure to comply with the discovery rule, Ala. R.Crim. P. 16, with disfavor; however, we also recognize that a failure to comply does not *492 always mandate reversal. McLemore v. State, 562 So.2d 639 (Ala.Crim.App.1989). Rule 16.5 provides as follows:
" 'If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such other order as the court deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.'
"....
"Rule 16.5 gives the trial court a range of sanctions that may be imposed in the event of noncompliance with the court's discovery order. The rules allow for the admission of probative evidence while ensuring that the opposing party has adequate time to review the evidence. Among these remedies are a recess and a continuance. Buchannon v. State, 554 So.2d 477 (Ala.Crim.App.), cert. denied, 554 So.2d 494 (Ala.1989) ; McLemore v. State. 'Moreover, the trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules.' McCrory v. State, 505 So.2d 1272, 1279 (Ala.Crim.App.1986) ; Pilley v. State, 789 So.2d 870, 881 (Ala.Crim.App.1998)."
Hardy v. State, 804 So.2d 247, 283-84 (Ala.Crim.App.1999). See also Fortenberry v. State, 545 So.2d 129, 142 (Ala.Crim.App.1988) ("A trial court may enter any order it 'deems just under the circumstances' whenever it learns that a party has failed to comply with its discovery order." (quoting Rule 18.5(a), Ala. R.Crim. P. (Temp.))); Rule 16.5, Ala. R.Crim. P. ("If ... a party has failed to comply ... with [a discovery] order[,] ... the court ... may enter such other order as the court deems just under the circumstances.").
When the circuit court learned that the State had not provided defense counsel with the recordings of Townes's conversations with Harris, it ordered the State to disclose the recordings and provided defense counsel a recess to listen to the recordings. It then prohibited the State from playing the recordings in front of the jury and prohibited the State from admitting into evidence any of Townes's statements on the recordings. Finally, it restricted the State to questioning Harris about only those statements she made that would show her bias or that would impeach her testimony. The circuit court's remedial measures were within its broad discretion. Accordingly, this Court cannot say that the circuit court abused its discretion, and this issue does not entitle Townes to any relief.
XX.
Townes next argues that, during the penalty phase, the State improperly relied on his statement that, if he was convicted of capital murder, then he wanted to be sentenced to death. Townes also argues that during the penalty phase the State improperly informed the jurors that their sentencing recommendation would be anonymous. This Court disagrees.
Townes first argues that during the penalty phase, the State improperly relied on his statement that, if convicted of capital murder, he would want to be sentenced to death. During the State's penalty-phase opening statement, the following occurred:
"[The State:] I expect to show you from testimony that this man right *493 over here, Tawuan Townes, says himself if he is convicted of capital murder, then he wants to be put to death. I will prove that to you.
"[Defense counsel]: Judge, I object. That hadn't been offered in discovery. We have no idea where that comes from.
"The Court: Sustained. Ladies and gentlemen, again, this is opening statements where the attorneys are going to tell you what they expect the evidence to be. Of course, you will determine what the true evidence is."
(R. 867-68.) Later, during the State's cross-examination of Harris, the following occurred:
"Q. Okay. Let me take you to January 11, 2011-January 1, 2011, and ask if you had a phone call with Tawuan Townes?
"A. Yes.
"Q. Do you remember that?
"A. Yes.
"Q. And do you remember talking about the death penalty?
"A. Yes.
"Q. Do you remember him saying that he had rather get death.
"A. No. No.
"[Defense counsel:] I object to what he said. That-
"The Court: Sustained.
"[Defense counsel:] This is improper.
"The Court: Sustained.
"[State:] This is a statement by the defendant.
"The Court: The objection is sustained.
"[State:] I need an exhibit number for this, please.
"[Defense counsel]: I object. This has never been provided to the defendant. There was an open discovery policy. He didn't file-
"The Court: Approach."
(Supp. R. 45-46.) Thereafter, the following discussion was held without the jury present:
"[Defense counsel]: One, it doesn't matter what Tawuan Townes said about what his punishment is. That is not relevant. That is not a statutory aggravating circumstance. He seemed to forget he is limited to three statutory aggravating circumstances, prove them. That doesn't have anything to do with statutory aggravating circumstances.
"[State]: This is a conversation that was between these two people. I have a right to show bias with what was said in conversation about this case. This is impeachment. They put this witness up. I didn't put her up in my case in chief. This defendant, he's had conversations with her.
"The Court: The objection is sustained.
"[State]: It doesn't-
"The Court: I said it was sustained. Do you want to argue with me?
"[State]: I would like to know a basis for your ruling, the reason, you won't allow me to impeachment[.]
"The Court: It's not an aggravator. You have three aggravators. You want me to list them? This is not an aggravator.
"[State]: [It] was an aggravator in a sense.
"The Court: It's not an aggravator. Objection sustained."
(Supp. R. 47-48.)
No error occurred in the circuit court's sustaining defense counsel's objection to the prosecutor's comment and instructing the jury that the attorneys state *494 only what they expect the evidence to be. Similarly, no error occurred when the circuit court sustained defense counsel's objection to the State's attempt to solicit testimony that Townes said he wanted to receive the death penalty if he was found guilty.
Further, even if the prosecutor's question regarding Townes's statement was improper, it resulted in no prejudice. The prosecutor asked Harris if she remembered Townes saying that he would rather receive a death sentence than life in prison, and she replied, "No. No." (Supp. R. 46.) Thus, there was no evidence presented indicating that Townes said he wanted to receive a death sentence. Rather, the inference from Harris's testimony was that Townes did not say that he wanted a death sentence. Accordingly, any error in the State's question was harmless. See Reeves v. State, 456 So.2d 1156, 1161 (Ala.Crim.App.1984) (holding that any error in a question seeking to solicit improper information is harmless when the question receives "a negative response"); Slater v. State, 575 So.2d 1208, 1211 (Ala.Crim.App.1990).
Townes also argues that the State improperly informed the jurors that, after they return their sentencing recommendation, the jurors would be polled but their votes would remain anonymous. Specifically, Townes argues that the following statement by the prosecutor was improper:
"I'll tell you the Judge will poll you, but he won't ask your names. He will just ask is that the vote of the jury. Okay?"
(R. 992.) According to Townes, "the prosecutor's comments impermissibly undermined the jury's sense of responsibility for imposing a death sentence." (Townes's brief, at 91.) Townes did not object to the prosecutor's comment; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
The issue of whether error results from informing the jurors that their individual sentencing recommendations will remain anonymous is an issue of first impression in this State. "It is well settled that plain-error review is an inappropriate mechanism to decide issues of first impression or to effectuate changes in the law." Kelley v. State, 246 So.3d 1032, 1052 (Ala.Crim.App.2014). See also United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("[A] court of appeals cannot correct an error [under the plain-error doctrine] unless the error is clear under current law."); United States v. Madden, 733 F.3d 1314, 1322 (11th Cir.2013) ("For a plain error to have occurred, the error must be one that is obvious and is clear under current law." (citations and quotations omitted)); United States v. Accardi, 669 F.3d 340, 348 (D.C.Cir.2012) ("[A] question of first impression ... would be inappropriate to address under plain error review."); United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir.2003) ("[T]here can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." (citations omitted)); United States v. Magluta, 198 F.3d 1265, 1280 (11th Cir.1999) ("[A] district court's error is not 'plain' or 'obvious' if there is no precedent directly resolving an issue."), vacated in part on unrelated grounds, 203 F.3d 1304 (11th Cir.2000). Whether error resulted from the prosecutor's comment "is an issue of first impression and thus not properly before this Court for plain-error review." Kelley, 246 So.3d at 1053 (citing Accardi, 669 F.3d at 348 ). Therefore, this issue does not entitle Townes to any relief.
XXI.
Townes also argues that the circuit court erred in failing to instruct the jury in the *495 penalty phase to consider mercy as a mitigating circumstance. Specifically, Townes argues that the circuit court's refusal to give his requested instruction regarding the jury's consideration of mercy in the penalty phase violated his right to due process, a fair trial, and a reliable sentencing. This Court disagrees.
It is well settled "that [in capital cases] the Eighth and Fourteenth Amendments require that the sentencer 'not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " Penry v. Lynaugh, 492 U.S. 302, 317, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), abrogated on other grounds, Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ) (emphasis omitted). Section 13A-5-52, Ala.Code 1975, provides:
"[M]itigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."
Thus, "the sentencer in a capital case may 'not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " Clemons v. State, 123 So.3d 1, 11 (Ala.Crim.App.2012) (emphasis omitted) (quoting Lockett, 438 U.S. at 604.)
Mercy, defined as "[c]ompassionate treatment," is not an aspect of a defendant's character or record or a circumstance of the offense. Black's Law Dictionary 1137 (10th ed.2014). Rather, mercy is what a capital defendant seeks from the jury, i.e., a sentence recommendation of life in prison without the possibility of parole as opposed to death. For that reason, " '[m]ercy' is not a mitigating circumstance under Alabama law." Hosch v. State, 155 So.3d 1048, 1109 (Ala.Crim.App.2013). Because mercy is not a mitigating circumstance, " ' "Alabama courts have held that capital defendants are not entitled to jury instructions on mercy[,]" Burgess v. State, 723 So.2d 742, 769 (Ala.Crim.App.1997) [, and] "[a] juror may not arbitrarily consider mercy when deciding whether a defendant should be sentenced to death or life imprisonment without the possibility of parole." Blackmon v. State, 7 So.3d 397, 438 (Ala.Crim.App.2005).' " Hosch, 155 So.3d at 1110 (quoting Albarran v. State, 96 So.3d 131, 210-11 (Ala.Crim.App.2011) ).
Consequently, the circuit court correctly refused to instruct the jury to consider mercy as a mitigating circumstance. Therefore, this issue does not entitle Townes to any relief.
XXII.
Townes next argues that the circuit court erroneously refused to give his requested instruction that the jury is never required to recommend a sentence of death and that it may recommend a sentence of life in prison without the possibility of parole for any reason. In other words, Townes argues that the circuit court erred by refusing to instruct the jury that it may ignore the circuit court's sentencing instructions and the sentencing procedure established in § 13A-5-46, Ala.Code 1975, and return a verdict recommending *496 life in prison without the possibility of parole for any reason. That is not the law.
Section 13A-5-46(a), Ala.Code 1975, establishes that a defendant convicted of a capital offense is entitled to a sentencing hearing before the jury. Section 13A-5-46(d), Ala.Code 1975, provides, in relevant part, "[a]fter hearing the evidence and the arguments of both parties at the sentence hearing, the jury shall be instructed on its function and on the relevant law by the trial judge." Section 13A-5-46(e), Ala.Code 1975, establishes the following weighing process and direction as to how the jury must vote:
"After deliberation, the jury shall return an advisory verdict as follows:
"(1) If the jury determines that no aggravating circumstances as defined in Section 13A-5-49 exist, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;
"(2) If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist but do not outweigh the mitigating circumstances, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;
"(3) If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death."
Thus, the legislature has established how the jury must vote depending on the balance of the aggravating circumstances and mitigating circumstances. Id. Further, under §§ 13A-5-46(d) and 13A-5-46(e), Ala.Code 1975, the circuit court must instruct the jury on the weighing process and how to vote after that process has been completed. The jury is not, as Townes argues, permitted to ignore the law and to reject a sentence of death for any reason. See 13A-5-46(e), Ala.Code 1975.
Because the jury is not free to reject a sentence of death for any reason but must follow the law and recommend a sentence accordingly, the circuit court did not err by refusing to instruct the jury that "the death penalty is never a required punishment." (Townes's brief, at 92.) See also Scott v. State, 163 So.3d 389, 458 (Ala.Crim.App.2012) (holding that the circuit court correctly refused to instruct the jury that "it was never required to recommend a sentence of death"). Therefore, this issue does not entitle Townes to any relief.
XXIII.
Townes next argues that the circuit court erred by failing to suppress the statement he gave to law-enforcement officers. Specifically, Townes argues that his statement was not voluntarily given because he was 18 years old, he had failed 2 grades in high school, he had to have the term "education level" explained to him, he lacked experience with the criminal-justice system, he was lied to regarding his accomplice's confession, and he was offered help if he confessed. According to Townes, each of these factors establishes that his confession was not voluntary. This Court disagrees.
Before admitting Townes's statement, the State presented evidence that Investigator Doug Magill of the Dothan Police Department was assigned to investigate Woods's murder. Investigator Magill and Officer Chris Barbaree interviewed Townes after he was arrested. Before interviewing him, Investigator Magill asked Townes, who was 18 years old and had attended the 10th grade, if he could *497 read, and Townes indicated that he could read.
After determining that Townes could read, Investigator Magill read Townes his Miranda [4] rights from a rights-waiver form. Investigator Magill then gave the rights-waiver form to Townes to read himself. Townes read the rights-waiver form and asked for clarification regarding what was meant by the term "education" or "education level." Investigator Magill explained that "education" was meant to inquire about the level of school Townes had completed. Investigator Magill then told Townes to sign the rights-waiver form if Townes wanted to speak with them.
At that point, Townes signed the rights-waiver form indicating the following:
"[He had] read this statement of [his] rights and [he] underst[oo]d what [his] rights [were]. [He was] willing to make a statement and answer questions. [He did] not want a lawyer at th[at] time. [He] underst[oo]d and kn[e]w what [he was] doing. No promises or threats [were] made to [him] and no pressure of any kind ha[d] been used against [him] to get [him] to make a statement."
(C. 490.) Investigator Magill testified that Townes did not appear to be under the influence of any drugs or alcohol. According to Investigator Magill, no one offered Townes any "hopes of remuneration, probation, or reward if he would make a statement." (R. 639-40.) Investigator Magill stated that no threats, inducements, or promises were made to Townes to get him to give a statement.
The State also admitted the video of Townes's statement, which corroborated Investigator Magill's testimony. On the video, Townes appears to be a young, articulate man who answered the police officers' questions appropriately. Townes does not appear to be under undue stress or pressure. The police officers did not threaten Townes or offer him any reward of leniency if he confessed. The video depicts the officers falsely informing Townes that his accomplice, Benton, was in custody and had confessed. Investigator Magill offered "the help that [he could] offer" to enable Townes "to air [his] side of the story ... instead of listening to one side of [the] story where somebody is just trying to throw everything on [Townes]." (C. 494-95.) However, the police officers did not offer Townes a lesser sentence.
"It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate." Waldrop v. State, 859 So.2d 1138, 1155 (Ala.Crim.App.2000) (citing Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) ). In Wilkerson v. State, 70 So.3d 442 (Ala.Crim.App.2011), this Court explained that "[t]o establish a proper Miranda predicate, the State must prove that 'the accused was informed of his Miranda rights before he made the statement' and that 'the accused voluntarily and knowingly waived his Miranda rights before making his statement.' " 70 So.3d at 460 (quoting Jones v. State, 987 So.2d 1156, 1164 (Ala.Crim.App.2006) ). This Court also explained that in determining whether an individual "voluntarily, knowingly, and intelligently" waived his Miranda rights, courts must consider "the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials in conducting the interrogation."
*498 Wilkerson, 70 So.3d at 460 (quoting Foldi v. State, 861 So.2d 414, 421 (Ala.Crim.App.2002) ).
Similarly, " '[t]o prove [the] voluntariness [of the confession], the State must establish that the defendant "made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him." ' " Wilkerson, 70 So.3d at 460 (quoting Eggers v. State, 914 So.2d 883, 898-99 (Ala.Crim.App.2004), quoting in turn, Lewis v. State, 535 So.2d 228, 235 (Ala.Crim.App.1988) ). "[A] confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency." McLeod v. State, 718 So.2d 727, 729 (Ala.1998) (citing Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) ). Like reviewing a Miranda waiver, "when determining whether a confession is voluntary, ... court[s] must consider the totality of the circumstances surrounding the confession." Wilkerson, 70 So.3d at 460 (quoting Maxwell v. State, 828 So.2d 347, 354 (Ala.Crim.App.2000) ).
"To determine if a defendant's will has been overborne, [a court] must assess 'the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; '[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson [v. State], 562 So.2d [1373,] 1380-81 [ (Ala.Crim.App.1990) ] (citations omitted)."
McLeod, 718 So.2d at 730. The Alabama Supreme Court has explained:
"[An] [a]ccused's intelligence, character and situation at the time of the confession of the crime charged are important considerations in determining whether the confession was voluntary, but the fact that accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary. State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726 [ (1956) ]. Evidence tending to show a defendant's weak mentality, feeblemindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility and effect to be given the confessions by the jury. State v. Stewart, 238 La. 1036, 117 So.2d 583 [ (1960) ]."
Elrod v. State, 281 Ala. 331, 334, 202 So.2d 539, 542 (1967) ; see also Jones v. State, 43 So.3d 1258, 1273 (Ala.Crim.App.2007) (same). Thus, "[w]hile an accused's intelligence and literacy are important factors, ... weak intellect or illiteracy alone will not render a confession inadmissible." Hobbs v. State, 401 So.2d 276, 282 (Ala.Crim.App.1981) (citations omitted); see also Hodges v. State, 926 So.2d 1060, 1073 (Ala.Crim.App.2005) (same); cf. Colorado v. Connelly, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that mental defects alone are insufficient to establish that a confession was involuntary under the Due Process Clause). Further, "trickery or deception by the police ... have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary." Ex parte Jackson, 836 So.2d 979, 983 (Ala.2002) (quoting Ex parte Hill, 557 So.2d 838, 841 (Ala.1989) ). See also United States v. Velasquez, 885 F.2d 1076, 1088 (3d Cir.1989) (false statement that co-actor had made statement against defendant and was being set free did not render confession involuntary).
Considering the totality of the circumstances, the State presented sufficient evidence to establish that Townes's statement *499 was voluntarily given. The record indicates that Townes was an 18-year-old man with an I.Q. score in the average range. Further, Townes had had some experience with the criminal-justice system.
Before interviewing Townes, Investigator Magill read him his Miranda rights. Townes then read his Miranda rights. Townes then signed the form indicating that he wished to waive those rights. The video, Investigator Magill's testimony, and the rights-waiver form all indicate that Townes understood his rights and that he had not been threatened, coerced, or promised anything in exchange for waiving those rights.
After waiving his rights, Townes gave an inculpatory statement. Townes's statement was not the product of any threats, inducements, or promises. During Townes's statement, he was fairly calm and did not appear to be under undue stress. Investigator Magill falsely told Townes that his accomplice had confessed and implicated Townes. However, Investigator Magill's falsehood is insufficient to render Townes's statement involuntary. See Ex parte Jackson, 836 So.2d at 983. Further, Investigator Magill offered to help Townes "to air [his] side of the story." (C. 494.) Investigator Magill's offer, however, does not rise to the level of coercion. See Hosch v. State, 155 So.3d at 1092 (holding that no coercion occurs when officers inform an accused that, if he cooperates, he could help his case). Rather, nothing on the video of Townes's statement indicates that Townes's "will was overborne by coercion or inducement." McLeod, 718 So.2d at 729.
Because there is no indication in the record that Townes's "will [to resist giving a statement] was overborne by coercion or inducement," McLeod, 718 So.2d at 729, the circuit court did not abuse its discretion by finding that Townes's statement was voluntarily given. Accordingly, this issue is without merit and does not entitle Townes to any relief.
XXIV.
Townes next argues that his death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States because he was 18 years old when he committed his capital offense. According to Townes, "evolving standards of decency prohibit sentencing eighteen-year-olds to death." (Townes's brief, at 95.) This Court disagrees.
In Thompson v. State, 153 So.3d 84, 176 (Ala.Crim.App.2012), as modified on denial of reh'g, this Court rejected the proposition that the Eighth Amendment prohibits sentencing an individual who was 18 years old at the time of the offense to death. Rejecting Thompson's argument, this Court held:
"Thompson next argues that sentencing an 18-year-old to death is cruel and unusual punishment in violation of the Eighth Amendment.
"The United States Supreme Court in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), held that it was unconstitutional to execute a defendant who was under the age of 18 when he committed murder. See also Adams v. State, 955 So.2d 1037 (Ala.Crim.App.2003), rev'd in part, 955 So.2d 1106 (Ala.2005). The United States Supreme Court stated:
" 'Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already *500 attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in Thompson [v. Oklahoma, 487 U.S. 815 (1988) ], drew the line at 16. In the intervening years the Thompson plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of Thompson extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.'
" 543 U.S. at 574.
"The Alabama appellate courts have applied the holding in Roper to those individuals who were under the age of 18 when they committed murder. See Ex parte Adams, 955 So.2d 1106 (Ala.2005) (Supreme Court remanded case, in which defendant was 17 years of age at the time of the murder, for reconsideration of sentence in light of Roper ); Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006) (remanded case for Hyde, who was 17 years old at the time of the offense, to be resentenced to life imprisonment without parole); Wimberly v. State, 931 So.2d 60 (Ala.Crim.App.2005) (death sentence set aside because Wimberly was 17 years old at the time of the murder); Duke v. State, 922 So.2d 179 (Ala.Crim.App.2005) (Duke's death sentence was vacated because Roper was released while case was pending on appeal and Duke was 17 years old at the time of the murders); Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005) (death sentence set aside because Duncan was 17 years old at the time of the murder).
"Thompson was 18 years of age at the time of the murders. Thus, his death sentence is consistent with Roper and the Eighth Amendment."
Thompson, 153 So.3d at 176-77. See also Schoenwetter v. State, 46 So.3d 535, 561 (Fla.2010) (holding that the Eighth Amendment does not prohibit imposing a sentence of death for an individual who was 18 years old at the time of the offense).
Similarly, Townes was 18 years old when he committed his capital offense. Consequently, Townes's age at the time of his offense does not render his sentence of death unconstitutional, and this issue does not entitle him to any relief.
XXV.
Townes next argues that his sentence of death violates the holding of the Supreme Court of the United States in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he argues that Ring was violated because the jury did not unanimously determine that the aggravating circumstances outweighed the mitigating circumstances. Townes further argues that the Alabama Supreme Court's holding Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), should be overruled because: 1) it allows for the imposition of a sentence of death without the jury unanimously finding that the aggravating circumstances outweigh the mitigating circumstances; 2) it "impermissibly eases the State's burden of proving that the death penalty is an appropriate punishment by holding that the jury need not be aware that its culpability phase finding alone may authorize the trial judge to impose the death penalty in certain cases"; and 3) it "undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty." (Townes's brief, at 96-97.)
*501 Rejecting identical arguments, this Court has held:
"Woolf contends that Ring v. Arizona, 536 U.S. 584 (2002) 'invalidates critical aspects of Alabama's capital sentencing scheme and renders his death sentence unconstitutional.' (Woolf's brief, p. 106.) Specifically, while acknowledging the Alabama Supreme Court's decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), Woolf: (1) 'disagrees with Waldrop 's holding that the Sixth Amendment does not require a jury to unanimously conclude that the aggravating circumstances outweigh the mitigating circumstances because the weighing process is a "moral" judgment rather than a determination requiring a quantum of proof'; (2) argues that 'Waldrop impermissibly eases the State's burden of proving that the death penalty is an appropriate punishment by holding that the jury need not be unaware that its culpability phase finding alone may authorize the trial judge to impose the death penalty in certain cases'; and (3) argues that the Waldrop decision 'undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty.' (Woolf's brief, pp. 106-08.)
"In Waldrop, the Alabama Supreme Court explained:
" 'Ring and Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in "an increase in a defendant's authorized punishment ..." or " 'expose[ ] [a defendant] to a greater punishment....' " Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348 ). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became "exposed" to, or eligible for, the death penalty. The trial court's subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an "element" of the offense.'
" Waldrop, 859 So.2d at 1190.
"Although Woolf may disagree with Waldrop, ' "[t]his Court has no authority to overrule Alabama Supreme Court precedent." ' Lane v. State, [169 So.3d 1076, 1135] (Ala.Crim.App.2013) (quoting Whatley v. State, [146 So.3d 437, 489] (Ala.Crim.App.2010) (opinion on return to remand))."
Woolf v. State, 220 So.3d 338, 385 (Ala.Crim.App.2014).
As in Woolf, Townes's arguments have been foreclosed by the Alabama Supreme Court's decision in Waldrop, and this Court has no authority to overrule that decision. Therefore, this issue does not entitle Townes to any relief.
XXVI.
Townes next argues that the circuit court erred by double counting burglary as both an element of his capital offense and as an aggravating circumstance. Specifically, Townes argues that double counting *502 burglary as both an element of the capital offense and as an aggravating circumstance "failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty in violation of the Eighth Amendment," and "subjected Mr. Townes to two punishments as a result of being convicted of a single criminal charge, in violation of the Double Jeopardy Clause of the Fifth Amendment to the United State Constitution, Article I, § 9 of the Alabama Constitution, and Ala.Code §§ 13A-1-8, 9 (1975)." (Townes's brief, at 98.)
Contrary to Townes's assertion, there is no constitutional or statutory prohibition against double counting certain circumstances as both elements of the offenses and aggravating circumstances. See § 13A-5-45(e), Ala.Code 1975 (providing that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing"). The Supreme Court of the United States, the Alabama Supreme Court, and this Court have all upheld the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) ("The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm."); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) ("The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866, 929 (Ala.Crim.App.2007) ; Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007) ; Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006) ; Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003) ; Coral v. State, 628 So.2d 954, 965-66 (Ala.Crim.App.1992) ; Haney v. State, 603 So.2d 368, 379-81 (Ala.Crim.App.1991). Further, double counting a circumstance as both an element of the offense and an aggravating circumstance does not result in two punishments stemming from of a single criminal charge, in violation of the Double Jeopardy Clause of the Fifth Amendment to the United State Constitution. See Smith v. State, 838 So.2d 413, 469 (Ala.Crim.App.2002) (holding that double counting a circumstances as both an element of the offense and an aggravating circumstance does "not result in double punishment for the same offense").
Because double counting is constitutionally permitted and statutorily required, Townes's argument is without merit. § 13A-5-45(e), Ala.Code 1975. Therefore, this issue does not entitle Townes to any relief.
XXVII.
Townes next argues that the process of ensuring that the jurors who serve on the jury are willing, in the correct circumstances, to impose a sentence of death, i.e., "death-qualifying" the jury, violated his constitutional right to an impartial jury. Specifically, Townes contends that "[s]ocial scientific evidence shows that (1) death-qualified juries are significantly more prone to convict than ordinary juries; (2) the process of pretrial death qualification, in which the defendant's guilt is assumed, conditions the jury towards guilt; and (3) death qualification disproportionately excludes minorities and women." (Townes's brief, at 99.) Thus, Townes argues, the process of death-qualifying the jury violated his "rights to due process, equal protection, a fair trial, and a reliable sentencing, as protected by the Fifth, *503 Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law." (Townes brief, at 99.) This Court disagrees.
The Supreme Court of the United States has upheld the constitutionality of death-qualifying a jury. See Lockhart v. McCree, 476 U.S. 162, 177-78, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995), this Court held:
"A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993)."
Davis, 718 So.2d at 1157 (footnote omitted). See also McCray, 88 So.3d at 76-77 ; Vanpelt, 74 So.3d at 50.
The practice of death-qualifying juries has been repeatedly held to be constitutional. Therefore, this Court finds no error in the circuit court's decision to death-qualify the jury. Accordingly, this issue does not entitle Townes to any relief.
XXVIII.
Townes next argues that Alabama's method of execution, lethal injection, constitutes cruel and unusual punishment in violation of the Eighth and Fourteen Amendments to the Constitution of the United States. This Court disagrees.
Townes's entire argument regarding lethal injection is as follows:
"The Eighth Amendment prohibits a method of execution that poses a 'substantial risk of serious harm.' Baze v. Rees, 553 U.S. 35, 52 (2008) (plurality opinion). Alabama's protocol is not 'substantially similar' to Kentucky's and therefore Baze is not controlling. See id. at 61 ; see also Arthur v. Thomas, 674 F.3d 1257, 1261 (11th Cir.2012). Mr. Townes's death sentence therefore constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution."
(Townes's brief, at 99-100.)
Townes's three-sentence argument completely fails to offer any reason why he believes lethal injection is unconstitutional. Rather, Townes, in cursory form, argues that lethal injection in Alabama is not "substantially similar" to lethal injection in Kentucky; therefore, the opinion of the Supreme Court of the United States in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), is not controlling. From there, Townes simply declares that lethal injection in Alabama "constitutes cruel and unusual punishment in violation of the Eight and Fourteenth Amendments to the United States Constitution." (Townes's brief, at 100.) Townes's argument fails to take into account the fact that he bears the burden to establish that lethal injection constitutes cruel and unusual punishment. See Harris v. Wright, 93 F.3d 581, 583 (9th Cir.1996) (recognizing that the appellant bears a heavy burden to establish that his sentence is cruel and unusual); cf. United States v. Johnson, 451 F.3d 1239, 1243 (11th Cir.2006) (explaining *504 that the appellant bears the burden to establish that his sentence in disproportionate); Cole v. State, 721 So.2d 255, 260 (Ala.Crim.App.1998) (recognizing that the appellant has the burden to establish that a State statute is unconstitutional); Holmes v. Concord Fire Dist., 625 So.2d 811, 812 (Ala.Civ.App.1993) ("The party mounting a constitutional challenge to a statute bears the burden of overcoming a presumption of constitutionality."). Because Townes bears the burden of establishing that lethal injection is unconstitutional and because he has failed to argue why lethal injection is unconstitutional, his argument is without merit.
Moreover, this Court, in Saunders v. State, held that "lethal injection does not constitute per se cruel and unusual punishment. See, e.g., McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007), and cases cited therein." 10 So.3d 53, 111 (Ala.Crim.App.2007). Further, both the Supreme Court of the United States and the Alabama Supreme Court have held that lethal injection does not constitute cruel and unusual punishment. Baze, 553 U.S. at 54-56 (holding that lethal injection does not violate the Eighth Amendment); Ex parte Belisle, 11 So.3d at 339 (holding that lethal injection is not unconstitutional); see also Glossip v. Gross, 576 U.S. ----, 135 S.Ct. 2726, 2732-46, 192 L.Ed.2d 761 (2015). Townes has not offered this Court any basis upon which to hold that lethal injection is unconstitutional.
Because Townes's claim has been rejected by the Supreme Court of the United States, the Alabama Supreme Court, and this Court and because he has not offered this Court any reason to revisit the issue, this issue does not entitle him to any relief.
XXIX.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of Townes's conviction and his sentence of death. Townes was indicted for, and convicted of, one count of capital murder for taking the life of Woods during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975.
The record does not reflect that Townes's sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In making this determination, the circuit court found that the State proved the existence of the following two aggravating circumstances: 1) that the capital offense was committed while Townes was engaged in the commission of a burglary, see § 13A-5-49(4), Ala.Code 1975; and 2) that the capital offense was committed while Townes was engaged in the commission of a robbery, see § 13A-5-49(4), Ala.Code 1975.
Regarding mitigating circumstances, the circuit court found and considered the following statutory mitigating circumstances: 1) that Townes had no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975; and 2) that Townes was a young adult-18 years old-at the time of the offense, see § 13A-5-51(7), Ala.Code 1975. The circuit court also considered the following evidence as mitigating circumstances:
"Tawuan Townes would have pled guilty to the crime if offered life [in prison] without parole as the sentence. He claims to be remorseful and cooperated with the police. He gave a statement and identified the co-defendant from a police photograph. He states that he asked the co-defendant not to shoot the victim and caused no harm to the girlfriend, India Sparks. He also *505 showed a lack of sophistication. He wanted to go to Mississippi to get his GED.
"[The] imposition of a death sentence would have a harsh effect on innocent family members. Additionally, he will receive emotional support in prison with a hope of rehabilitation.
"Defendant's mother was not there for him during much of his life. Tawuan's father left when Tawuan was about 4 years old. His early life was characterized by poverty as the family moved repeatedly, often to run out on the rent. Tawuan suffers from a conduct disorder that began when he was 5 years old. There was a lack of guidance as a youth. He had not seen his mother since he was 15 as she was in prison. Defendant was exposed to domestic violence. At the time of the murder[,] he had no stable place to live. He may also be a father.
"Defendant did not have a significant history of problems in jail for the past years and has not been a threat to jail security officers. His behavior was appropriate during trial and he will spend the rest of his life in prison.
"Since the [D]epartment of [C]orrections started keeping records of executions, 75% of all executions were African Americans. Houston County sentences a disproportionate number of African Americans to death. Of those on death row from Houston County, 59% are African American when African Americans make up only 25% of Houston County's population.
"It should be noted that there was some evidence of many of these non-statutory mitigators but not all. Additionally, some mitigators require speculation, (e.g., 'hope of rehabilitation' [and] 'may be a father'). The Court considers these non-statutory mitigating circumstances and gives them varying weight. Also, the percentage of African Americans sentenced to death is more of a legal argument than mitigator. This Court has sentenced two black males and one black female to death and two black males to life without paroles. On the other hand, three white males have been sentenced to death and one white male to life without parole."
(C. 324-25.) The sentencing order shows that the circuit court properly weighed the aggravating circumstances and the mitigating circumstances and correctly sentenced Townes to death. The record supports the circuit court's findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating circumstances and the mitigating circumstances to determine whether Townes's sentence of death is proper. After independently weighing the aggravating circumstances and the mitigating circumstances, this Court finds that Townes's death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must now determine whether Townes's sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. Townes was convicted of one count of murder committed during the course of a burglary. Further, the circuit court found as aggravating circumstances that the murder was committed during the course of a burglary and during a robbery. A sentence of death has been imposed for similar crimes throughout this State. See Brown v. State, 11 So.3d 866, 901 (Ala.Crim.App.2007) ; Washington v. State, 922 So.2d 145 (Ala.Crim.App.2005) ; Melson v. State, 775 So.2d 857, 863 (Ala.Crim.App.1999). Therefore, this Court finds that the *506 sentence was neither excessive nor disproportionate.
Finally, this Court has searched the entire record for any error that may have adversely affected Townes's substantial rights and has not found any. See Rule 45A, Ala. R.App. P.
Accordingly, Townes's conviction and his sentence of death are affirmed.
OPINION OF JUNE 13, 2014, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.

"A SIM, or security identity module, card is the device within a phone that contains the unique information identifying a particular subscriber." United States v. Moreno, 701 F.3d 64, 71 n. 9 (2d Cir.2012) (internal quotation marks omitted).

Townes states in his brief to this Court that the State "used [its] peremptory strikes to remove all but one of the qualified African Americans from the venire." (Townes's brief, at 43.) This statement is not accurate.

Defense counsel objected to the original presentence report on a number of grounds, including that the report contained inaccurate information. (C. 280.)

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).